OPINION
{¶ 1} Defendant-appellant, Chad Copeland, appeals his convictions and sentence in the Butler County Court of Common Pleas for aggravated theft by deception, grand theft by deception, money laundering, misrepresentation in the sale of securities, and passing bad checks.
 {¶ 2} In January 2001, appellant approached Bob Gougenhour, a graphic designer who owns Creative Designs Advertising, Inc., in Middletown, Ohio. Appellant hired Gougenhour to design a logo for a business called Snackland USA. After Bob designed the logo for Snackland, appellant told him about another business appellant planned to start called Hot Diggity Dog, which appellant envisioned as a fast food restaurant specializing in selling hot dogs and specialty sausages. Appellant explained to Bob his need for investors in order to get Hot Diggity Dog started, and eventually convinced Bob and his wife Marilyn to invest $70,000 in Snackland and Hot Diggity Dog. Appellant told the Gougenhours he would invest this money in a Raymond James brokerage account, and they would be able to view the status of this account on the internet. Appellant assured the Gougenhours their principal investment would be safe and would earn a 12 percent daily return.
 {¶ 3} In April 2001, appellant moved into a suite in the office building Bob owned, and began to utilize Bob's secretary, Connie Kerr, to keep track of financial transactions for Snackland. Appellant also opened a checking account at First National Bank of Southwest Ohio ("FNB"), because Marilyn was a vice president and manager of the Springboro branch. Although appellant opened the account in the name of Snackland USA, appellant, Bob, and Marilyn were all signatories on the account.
 {¶ 4} On June 12, 2001, the balance of the Snackland FNB account was $266. On June 14, appellant withdrew $14,000 from the Raymond James account and deposited $13,000 in the FNB account. On June 14 and 15, appellant tendered checks drawn from the FNB account totaling $206,548.88. Over the next five days, appellant deposited into the FNB account checks drawn from his mother's checking account at Fifth Third Bank ("5/3") totaling $251,955.76, even though the balance of the 5/3 account was only $720. Appellant then tendered a $10,000 check to Bob, and tendered two checks to his mother totaling $388,868.88, which were deposited in her 5/3 account. Appellant then withdrew $43,044.12 from the FNB account, and tendered three checks drawn from the FNB account to the Raymond James fund which totaled $360,631.14.
 {¶ 5} On June 20, appellant deposited into the FNB account funds from another check drawn from his mother's 5/3 account in the amount of $155,697.32. The next day, appellant tendered another check drawn from the FNB account in the amount of $362,412, and deposited that in the Raymond James account. The same day, appellant withdrew $141,915 and purchased a home at 3873 Knollbrook Drive in Warren County ("the Knollbrook house") in the name of Snackland USA.
 {¶ 6} Appellant then withdrew $145,000 from the Raymond James account and deposited it into the FNB account, along with two more checks from his mother's 5/3 account totaling $993,350.12. Next, appellant tendered two checks to his mother totaling $1,363,150.94, which were deposited in her 5/3 account.
 {¶ 7} On June 25, appellant tendered a check, drawn from the FNB account, in the amount of $77,494.23 to White Allen Jaguar for the purchase of a 2001 Jaguar automobile. The same day, appellant withdrew $258,416 from the FNB account and deposited it in the Raymond James account. Appellant then deposited into the FNB account funds from four checks drawn from his mother's 5/3 account totaling $1,928,258.24.
 {¶ 8} Next, appellant tendered checks drawn from the FNB account to Value City Furniture and Connie Kerr, totaling $20,336.44, withdrew $9,200 from the FNB account, and transferred $91,504 from the FNB account to the Raymond James account. Appellant then made a series of withdrawals from the Raymond James account totaling $491,810.56.
 {¶ 9} Also on June 25, Deborah Turner, an FNB security officer, began an investigation into irregularities with the FNB account. Turner received notice from 5/3 that it would not honor checks that had been deposited in the FNB account because the 5/3 account lacked sufficient funds. Turner then examined the FNB account and discovered that several large deposits had been made into the FNB account from this 5/3 account, and that the FNB account would be significantly overdrawn when the 5/3 checks were returned to FNB. Turner also noticed several large withdrawals, including payments to the Raymond James account and the 5/3 account. Turner recognized this pattern of activity as "check kiting," and contacted appellant to notify him that he needed to account for the deficiency in the account since 5/3 refused to honor the checks. After a series of conversations, appellant ultimately failed to fund the FNB, such that the account was overdrawn by $1,745,898.96.
 {¶ 10} Meanwhile, from September through December 2001, appellant persuaded Kerr and her husband to invest $150,000 in his business ventures. In return for their investment, appellant issued to the Kerrs 150 stock certificates that indicated the Kerrs owned 150 shares of stock in Hotshots, Inc., an investment corporation. Appellant, on behalf of Hotshots, and the Kerrs signed a promissory note which provided that appellant would pay the Kerrs $6,000 every 45 days until he paid a total of $240,000. While appellant did make one $6,000 payment, the Kerrs did not receive any more money from appellant or anyone else on behalf of Hotshots.
 {¶ 11} Appellant was charged with 23 crimes in total, including two counts of aggravated theft by deception, one count of grand theft by deception, one count of money laundering, nine counts of misrepresentation in the sale of securities, two counts of fraudulent practices in the sale of securities, and eight counts of passing bad checks. After a jury trial, appellant was convicted on all counts, except for the counts of fraudulent practices, which the court found were allied offenses of similar import. The trial court imposed a 23-year prison sentence, ordered appellant to pay $216,500 in fines, and $868,381.68 in restitution. Appellant appeals his convictions and sentence, raising five assignments of error. For the purpose of clarity, we will discuss the assignments of error out of order.
 {¶ 12} Assignment of Error No. 3:
 {¶ 13} "THE TRIAL COURT ERRED IN CONVICTING THE APPELLANT OF COUNTS 15-23."
 {¶ 14} Appellant argues the trial court erred in overruling appellant's motion to dismiss the case for insufficient proof of venue. Appellant maintains the check counts have nothing but a "tangential" relationship with Butler County. We disagree.
 {¶ 15} In determining whether the state has proved venue beyond a reasonable doubt, appellate courts should apply the sufficiency of the evidence standard of review. State v. Brown, Mahoning App. No. 03-MA-32, 2005-Ohio-2939, ¶ 79. Accordingly, we must "examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
 {¶ 16} R.C. 2901.12(A) provides, "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed."
 {¶ 17} While not a material element of the offense charged, the state must prove venue in criminal prosecutions unless the defendant has waived it; otherwise, the defendant cannot be convicted. State v. Headley
(1983), 6 Ohio St.3d 475, 477. "The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." Id.
 {¶ 18} There is no distinction between "mere preparation" and the "full completion" of the crime for purposes of establishing venue. Statev. Hackworth (1992), 80 Ohio App.3d 362, 366. To establish venue, the state must prove that the defendant had a significant nexus with the county of venue. Id. Where the transaction which forms the basis of the crime is planned or agreed to in the county of venue, it is appropriate for the trial for that crime to take place in that county. Id.
 {¶ 19} According to the record, appellant ran the daily operations of Snackland from office space he rented from Bob in Middletown, Ohio. According to the incorporation documents for Snackland USA, the corporate address of Snackland is 5016 DuBois Court, Middletown, Ohio. Appellant opened the FNB checking account in the name of Snackland USA, tendered checks drawn from that checking account on behalf of Snackland, and endorsed checks written to Snackland. In addition, appellant instructed Kerr to cash a check he tendered to her from the Snackland FNB account at the Middletown branch of FNB.
 {¶ 20} This evidence, if believed, could lead a reasonable juror to conclude that appellant had a significant nexus with Butler County in conducting the activities which led to his trial and conviction. Accordingly, we find sufficient evidence to prove that Butler County was the proper venue for appellant's trial.
 {¶ 21} Next, appellant argues that his convictions for the check counts are based on insufficient evidence and that his convictions are against the manifest weight of the evidence, with regard to proof appellant transferred or issued the checks, appellant knew the checks would be dishonored, and appellant had intent or purpose to defraud. Appellant appears to challenge both the sufficiency of the evidence and the manifest weight of the evidence. Sufficiency of the evidence and weight of the evidence are legally distinct issues. State v. Thompkins,78 Ohio St.3d 380, 386, 1997-Ohio-52. Because appellant has failed to make any substantive argument related to his allegation that his convictions are against the manifest weight of the evidence other than a recitation of the appellate standard of review, we will only address appellant's sufficiency arguments. See App.R. 12(A)(2); App.R. 16(A)(7).
 {¶ 22} Count 15 of the indictment alleges appellant committed aggravated theft in violation of R.C. 2913.02(A)(3). While appellant assigns as error his conviction for Count 15, he has not made any substantive argument to support that assertion. According to App.R. 16(A), "[t]he appellant shall include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." An appellate court may disregard an assignment of error where the litigant has not provided any substantive argument in its brief for its assignment of error. State v.Rivers (1977), 50 Ohio App.2d 129; Nehls v. Quad-K. Advertising, Inc.
(1995), 106 Ohio App.3d 489. Accordingly, we will not address the sufficiency of the state's evidence to support appellant's conviction on Count 15.
 {¶ 23} Counts 16, 17, 18, 19, 20, 21, 22, and 23 of the indictment allege appellant committed the crime of passing bad checks in violation of R.C. 2913.11(A)[1] and appellant was convicted on all eight counts. According to R.C. 2913.11(B), "[n]o person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored or knowing that a person has ordered or will order stop payment on the check or other negotiable instrument." R.C. 2913.01(B) defines "defraud" as, "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another." Further, according to R.C. 2913.01(A), "deception" means, "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 24} First, appellant argues the state failed to present sufficient evidence he issued or transferred the checks upon which his check fraud convictions are based. We disagree.
 {¶ 25} R.C. 1303.01(A) provides:
 {¶ 26} "* * *
 {¶ 27} "(3) `Drawer' means a person who signs or is identified in a draft as a person ordering payment.
 {¶ 28} "* * *
 {¶ 29} "(5) `Issue' means the first delivery of an instrument by the maker or drawer to a holder or nonholder for the purpose of giving rights of the instrument to any person.
 {¶ 30} "(6) `Issuer' means a maker or drawer of an issued or unissued instrument."
 {¶ 31} Further, R.C. 1303.22(A) provides, "[a]n instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument."
 {¶ 32} Counts 16, 17, 18, 19, 21, 22, and 23 of the indictment are based on checks drawn from the 5/3 account, where the drawer was appellant's mother, and the payee was Snackland. Count 20 is based on a check appellant tendered from the FNB account to his mother, where appellant signed his own name as the drawer. According to the testimony of appellant's former girlfriend, appellant took several checks from his mother after telling her to sign them. Each of these checks was either endorsed by Snackland or deposited in the Snackland FNB account. Appellant held the title of secretary, president, vice president, and CEO of Snackland, and the evidence at trial indicates that nobody other than appellant deposited checks into the Snackland FNB account.
 {¶ 33} Although much of this evidence against appellant is circumstantial, this evidence, if believed, could lead a reasonable juror to conclude that appellant issued or transferred each of the checks. Circumstantial evidence and direct evidence have the same probative value, and in some instances, certain facts can only be established by circumstantial evidence. Jenks, 61 Ohio St.3d at 272. Moreover, a conviction based solely on circumstantial evidence is no less sound than one based on direct evidence. State v. Begley (Dec. 21, 1992), Butler App. No. CA92-05-076, 5.
 {¶ 34} Next, appellant argues that he could not be convicted of passing bad checks without notice that the checks were presented and dishonored. Appellant maintains that without this evidence, the state cannot prove the "knowledge" element of R.C. 2913.11(B). However, appellant's argument is misplaced.
 {¶ 35} R.C. 2913.11(C) provides:
 {¶ 36} "For purposes of this section, a person who issues or transfers a check or other negotiable instrument is presumed to know that it will be dishonored if either of the following occurs:
 {¶ 37} "(1) The drawer had no account with the drawee at the time of issue or the stated date, whichever is later;
 {¶ 38} "(2) The check or other negotiable instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, indorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor."
 {¶ 39} "[R.C. 2913.11(C)] provides a rebuttable presumption to assist the state in meeting its burden of proof with regard to the element of knowledge." State v. Hines (July 3, 1995), Butler App. No. CA94-09-182, 4-5. "While presentment and notice of dishonor are required in order for the state to take advantage of the statutory presumption, they are not required to prove the element of knowledge that the checks would be dishonored for purposes of the offenses of passing bad checks set out in [R.C. 2913.11(B)]." Id. at 5. "Where * * * the state chooses not to rely upon the statutory presumption or the presumption is inapplicable, the element of knowledge may be proven by other means than evidence of presentment and dishonor." Id.
 {¶ 40} R.C. 2901.22(B) provides, "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
 {¶ 41} According to the testimony of Leo Palabis, a forensic accountant for the Ohio Attorney General's Office, the balance of the FNB account was $266 and the balance of the 5/3 account was $720 before appellant began tendering checks and making deposits. Palabis explained that appellant engaged in a practice known as "check kiting," where a person tenders and deposits checks between two accounts, artificially inflating the balance of the accounts such that it appears the accounts are significantly funded when in actuality, the funds to not exist.
 {¶ 42} Turner, FNB's fraud investigator, testified that appellant was aware there were insufficient funds in his mother's 5/3 account to cover the checks he deposited in the FNB account. During a conversation in which the investigator explained to appellant that FNB needed him to account for these funds, appellant told her, "I'm not worried about the bank. There is nothing you can do. I'm a corporation. I've gotten away with this before. Even if you try to do something it will take you at least three years."
 {¶ 43} This evidence, if believed, could lead a reasonable juror to conclude that appellant was aware that writing and depositing checks from accounts with insufficient funds would probably cause the checks to be dishonored when the banks discovered the accounts were not sufficiently funded. Accordingly we find the state presented sufficient evidence to prove the "knowledge" element as required by R.C. 2913.11(B).
 {¶ 44} Next, appellant argues the state failed to sufficiently prove he acted with purpose or intent to defraud. Intent to defraud is defined as "the false representation of a past or existing fact, whether by oral or written words or conduct, which is calculated to deceive, intended to deceive and does in fact deceive and by means of which one person obtains value from another without compensation." State v. Creachbaum (1970),24 Ohio App.2d 31, 37. The detriment suffered by a payee is sufficient to satisfy the element of purpose to defraud where "a check is tendered with the purpose of inducing the temporary belief that a shortage has been paid, thus delaying potential collection processes or concealing shortages in other respects." State v. Suber,154 Ohio App.3d 681, 693.
 {¶ 45} Appellant maintains he could not be convicted of passing bad checks because Marilyn, as branch manager of FNB, knew of and approved his check kiting scheme. Appellant argues this negates the purpose to defraud element of R.C.R.C. 2913.11(B), as the bank merely loaned appellant the funds on a short term basis to cover the overdrafts. Further, appellant claims he reasonably expected the checks he tendered and deposited would be honored when presented for payment. Again, appellant's reasoning is misplaced, and his assertions are not supported by the evidence.
 {¶ 46} There is no evidence that Marilyn knew of or authorized appellant's check kiting scheme before the banks initiated the investigations. According to the record, Marilyn authorized not placing a hold on checks appellant deposited into the FNB account, which made the funds immediately accessible. However, the testimony admitted at trial indicated Marilyn became alarmed when appellant overdrafted the account. In fact, Marilyn informed appellant that she "could not be involved with anything that looked like a kite on the account, and that she was concerned that he was kiting between [FNB and 5/3]."
 {¶ 47} While a belief that checks will be honored when presented for payment constitutes a defense to the crime of passing bad checks, such a belief must be reasonable in light of the circumstances. State v. Stemen
(1951), 90 Ohio App. 309, 318; State v. Valentine (July 18, 1988), Butler App. No. 87-07-091, 5. Any expectation appellant may have had with regard to the availability of funds in either the FNB or 5/3 accounts was not subjectively reasonable. Appellant knew both accounts were insufficiently funded to cover the checks written, and that the positive balances of the accounts were based on a series of checks that were certain to be dishonored once the banks discovered the check kiting. Moreover, the record indicates Marilyn made the funds in the FNB account available to appellant only upon his misrepresentation that the 5/3 account was sufficiently funded.
 {¶ 48} This evidence could lead a reasonable mind to conclude that appellant's purpose in writing and depositing checks between the FNB and 5/3 accounts was to artificially inflate the accounts to give the appearance that the accounts were funded. Accordingly, we find the state presented sufficient evidence to prove appellant acted with purpose or intent to defraud as required by R.C. 2913.11(B).
 {¶ 49} Appellant's third assignment of error is overruled.
 {¶ 50} Assignment of Error No. 4:
 {¶ 51} "THE TRIAL COURT ERRED IN CONVICTING THE APPELLANT OF COUNTS 1-14."
 {¶ 52} Appellant argues his convictions for the securities counts are based on insufficient evidence and his convictions are against the manifest weight of the evidence. Again, appellant appears to challenge both the sufficiency of the evidence and the manifest weight of the evidence, yet fails to argue the issue of manifest weight. Accordingly, we will only address whether the evidence admitted at trial is sufficient to sustain these convictions.
 {¶ 53} Appellant argues the state failed to prove appellant used deception to cause or induce the Kerrs to make investments of $50,000 and $100,000 in Hot Shots, Inc. We disagree.
 {¶ 54} Counts 1 and 2 of the indictment allege appellant committed aggravated theft by deception and grand theft by deception, respectively, in violation of R.C. 2913.02(A)(3). According to R.C.2913.02(A)(3), "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or the services * * * [b]y deception * * *." R.C. 2913.01(A) defines "[d]eception" as, "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
 {¶ 55} According to the record, appellant promised Kerr that any investment she and her husband made would earn a 12 percent daily return. Kerr testified appellant represented himself as being "good at investments," and used Snackland as an example. However, appellant did not explain how he artificially inflated the value of Snackland using the check kiting scheme. Further, Kerr testified that appellant used the Raymond James statements to demonstrate his success as an investor. Appellant failed to disclose how he funded the Raymond James account with money he stole from FNB and 5/3.
 {¶ 56} This evidence, if believed, could lead a reasonable juror to conclude appellant knowingly deceived the Kerrs by making false representations with respect to the legitimacy of Snackland's value and the Raymond James account. Accordingly, we find the state presented sufficient evidence to prove appellant used deception to cause or induce the Kerrs into investing in his business ventures.
 {¶ 57} Count 3 of the indictment alleges appellant committed money laundering, in violation of R.C. 1315.55(A)(2). R.C. 1315.55(A)(2) provides, in relevant part, "[n]o person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property * * *." Appellant argues the state failed to sufficiently prove he acted to "hide" the money the Kerrs invested. We disagree.
 {¶ 58} The record indicates the Kerrs made two investments, of $50,000 and $100,000 respectively, in Hot Shots, Inc., an investment corporation. According to Suzanne Jordan, an attorney for the Ohio Department of Commerce, appellant deposited the first investment of $50,000 into a River Valley Credit Union account in the name of Hot Diggity Dog on September 17, 2001, and tendered a check to the Kerrs for $6,503.03. The same day, appellant tendered a check to an Edward Jones brokerage account, but then stopped payment on the check. Appellant then proceeded to divide the money among several bank accounts, including a DayAir Credit Union account and a Park National Bank ("Park Bank") account in the name of Snackland USA. Jordan also testified that appellant used approximately $15,103.63 of the Kerrs' investment for personal expenses, including improvements to the Knollbrook house. However, appellant represented to the Kerrs he had used their investment to purchase stock in Yahoo.
 {¶ 59} Jordan further testified that appellant took a second check from the Kerrs, for $100,000, and deposited it into a Park Bank account in the name of Hot Shots Restaurants of the Midwest on December 17, 2001. The same day, appellant transferred $50,000 of that money from the Hot Shots Park Bank account to the Snackland Park Bank account and transferred another $25,000 of the investment to an account at First Union Securities ("First Union"). The next day, appellant transferred the remaining $25,000 to the Snackland Park Bank account. Appellant then transferred $7,921.40 from the First Union account back into the Snackland Park Bank account, and tendered checks totaling $12,680 to his former girlfriend, checks totaling $51,836.39 to pay for personal expenses, a $25,000 check to an Infinity car dealership, and a $16,200 check to his attorney.
 {¶ 60} This evidence, if believed, could lead a reasonable juror to conclude that through these transactions, appellant knowingly acted to conceal or disguise the nature, location, ownership, or control of the Kerrs' investment. Accordingly, we find the state provided sufficient evidence to support appellant's conviction for money laundering.
 {¶ 61} Counts 4 and 5 of the indictment allege appellant committed misrepresentation in the sale of securities in violation of R.C.1707.44(B)(4). R.C. 1707.44(B)(4) provides, "[n]o person shall knowingly make or cause to be made any false representation concerning a material and relevant fact, in any oral statement or in any prospectus, circular, description, application, or written statement, for * * * [purposes of] * * * [s]elling securities in this state * * *." To be convicted of violating R.C. 1707.44(B)(4), the state must prove that, at the time of the sale of securities, the defendant had no intention to keep promises made in connection with the sale. State v. Walsh (1979),66 Ohio App.2d 85, 90. Appellant argues the state failed to sufficiently prove he had no intention to invest appellant's money in Hot Shots, Inc. at the time the Kerrs gave him their money. We disagree.
 {¶ 62} Kerr testified at trial that she and her husband invested a total of $150,000 in Hot Shots, Inc., which was an investment corporation, and that appellant told them this money would be invested in the stock market. According to the record, appellant did not invest any of their money in Hot Shots, Inc. As discussed above, appellant divided the Kerrs' money into various bank and credit union accounts and then used it for personal expenses. Kerr testified that in addition to promising a 12 percent daily return, appellant also promised their principal investment would never be touched, and they would receive installment payments of $6,000. The Kerrs did receive one of those payments, but did not receive any other payments from appellant. From this evidence, a reasonable juror could infer appellant did not intend to invest the Kerrs' money in Hot Shots, Inc. at the time they gave appellant their money. Accordingly, we find the state provided sufficient evidence to support appellant's conviction for misrepresentation in the sale of securities with respect to Counts 4 and 5.
 {¶ 63} Count 6 of the indictment alleges appellant committed misrepresentation in the sale of securities, in violation of R.C.1707.44(B)(4), for misrepresentations made in the promissory note he signed in connection with the Kerrs' investment of $150,000. Appellant maintains that because he gave the Kerrs a promissory note after the sale of the securities, he could not have made a misrepresentation at the time of the sale which is required for a conviction pursuant to 1707.44(B)(4). However, appellant's argument is not supported by the evidence.
 {¶ 64} According to the record, appellant sold 50 shares of stock in Hot Shots, Inc. for $50,000 on September 17, 2001. In addition, appellant sold an additional 100 shares of stock in Hot Shots, Inc. for $100,000 on December 1, 2001, which is the date of the promissory note, and the date on which appellant promised to pay the Kerrs $240,000 in installments of $6,000 every 45 days beginning on January 15, 2002.
 {¶ 65} Since appellant signed the promissory note at the time he made the second sale, at which time he represented he would pay the Kerrs $240,000, a reasonable juror could conclude appellant did not intend to pay the Kerrs that money at the time he made the promise to do so. Accordingly, we find the state provided sufficient evidence to support appellant's conviction for misrepresentation in the sale of securities with respect to Count 6.
 {¶ 66} Counts 7, 8, 9, 10, 11, and 12 of the indictment allege appellant committed misrepresentation in the sale of securities, in violation of R.C. 1707.44(B)(4), for falsely portraying himself as a an investor capable of obtaining a 12 percent return on investment, and for misrepresenting that the Kerrs would never lose their principal investment. Appellant argues the state failed to sufficiently prove that at the time of the sale of securities, he had no intention to keep these promises, and that the representations were relevant and material to the Kerrs' decision to invest. We disagree.
 {¶ 67} In addition to the evidence discussed above, Kerr testified she and her husband invested in Hot Shots, Inc. because of appellant's representations, and was not concerned about the safety of their money because of those representations. From this evidence, and the evidence discussed above, a reasonable juror could infer that appellant did not intend to keep these promises, and that the Kerrs decision to invest was based on the representations appellant made.
 {¶ 68} While appellant assigns as error his convictions for Counts 13 and 14, he has failed to cite to cite any legal authority, cite any portion of the record, or present any specific argument with respect to these convictions. Moreover, our review of the record indicates the trial court merged Count 13 with Count 9 and Count 14 with Count 10, such that appellant was not convicted of Counts 13 and 14.
 {¶ 69} Appellant's fourth assignment of error is overruled.
 {¶ 70} Assignment of Error No. 1:
 {¶ 71} "THE TRIAL COURT ERRED IN NOT SEVERING THE `CHECK' COUNTS FROM THE `SECURITIES' COUNTS FOR TRIAL."
 {¶ 72} In his first assignment of error, appellant argues that counts in an indictment should not be joined for trial where they relate to different victims, witnesses, locations, venues, times, dates, and events that are not related. Counts 1 through 14 of the indictment allege appellant stole money from FNB and 5/3 by passing bad checks and counts 15 through 23 allege that appellant engaged in securities fraud. Appellant maintains that the trial court abused its discretion in refusing to sever two separate courses of conduct for purposes of trial. We disagree.
 {¶ 73} An appellate court will not reverse a trial court's ruling denying a motion for severance absent an abuse of discretion. State v.Skatzes, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 33. An abuse of discretion connotes more than an error in law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.State v. Barnes, 94 Ohio St.3d 21, 23, 2002-Ohio-68.
 {¶ 74} Crim.R. 8(A) permits the joinder of offenses "if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Nonetheless, if it appears that a criminal defendant would be prejudiced by such joinder, the trial court is required to order separate trials. See Crim.R. 14.
 {¶ 75} A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. State v. Sapp,105 Ohio St.3d 104, 2004-Ohio-7008, ¶ 69. When a defendant claims that he was prejudiced by the joinder of multiple offenses, a court must determine whether evidence of the other crimes would be admissible even if the counts were severed, and if not, whether the evidence of each crime is simple and distinct. State v. Schaim, 65 Ohio St.3d 51, 59,1992-Ohio-31, citing State v. Hamblin (1988), 37 Ohio St.3d 153, 158-159.
 {¶ 76} Our first inquiry is the extent to which evidence of these crimes would be admissible in separate trials if the counts were severed. Evid.R. 404(B) provides, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 77} According to the record, Kerr testified that appellant represented himself as being "good at investments," and used Snackland as an example. In addition, Kerr testified appellant used the Raymond James account statements to demonstrate his success as an investor. The evidence indicates appellant caused the balance of the Raymond James account to increase significantly by depositing checks drawn from the FNB account, the value of which he artificially inflated through the check kiting scheme. Accordingly, evidence related to the check counts would have been admissible in a separate trial on the securities counts, to prove appellant's plan or scheme in persuading Kerr to make the investments.
 {¶ 78} While evidence of the check counts would be admissible in a trial on the securities counts, the state has failed to show that evidence of the securities counts would be admissible in a separate trial on the check counts. However, appellant was not prejudiced by the joinder of the check and securities counts for trial, because the evidence of each of the crimes was simple and direct, such that the jury was capable of segregating the proof of each charge. See State v. Roberts (1980),62 Ohio St.2d 170, 175. The state used separate exhibits and witnesses to prove the check counts and the securities counts in a clear and distinct manner, to eliminate the possibility of jury confusion. Appellant has failed to demonstrate prejudice in the joinder of the check and securities accounts. We find the trial court did not abuse its discretion in denying appellant's motion to sever, as appellant has failed to demonstrate prejudice by the joinder of the check and securities counts. Appellant's first assignment of error is overruled.
 {¶ 79} Assignment of Error No. 2:
 {¶ 80} "THE TRIAL COURT ERRED IN TRYING THE DEFENDANT FOR MULTIPLE THEFT OFFENSES FROM THE SAME COURSE OF CONDUCT."
 {¶ 81} Appellant argues that Counts 1, 2, and 15 should have been tried as a single offense, because they were a series of offenses committed in the same relationship with the same victim. Appellant maintains where an offender commits theft from the same victim multiple times in an ongoing relationship, R.C. 2913.61(C)(1) mandates that the offenses be tried as a single offense.
 {¶ 82} R.C. 2913.61(C) provides, in relevant part:
 {¶ 83} "(1) When a series of offenses under [R.C. 2913.02] * * * is committed by the offender in the offender's same employment, capacity, or relationship to another, all of those offenses shall be tried as a single offense. The value of the property or services involved in the series of offenses for the purpose of determining the value as required by division (A) of this section is the aggregate value of all property and services involved in all offenses in the series.
 {¶ 84} "(2) If an offender commits a series of offenses under section2913.02 of the Revised Code that involves a common course of conduct to defraud multiple victims, all of the offenses may be tried as a single offense."
 {¶ 85} According to Count 2 of the Bill of Particulars, on September 17, 2001, appellant committed theft by deception in violation of R.C.2913.02 when he deprived the Kerrs of $50,000 by representing to them that they were investing in Hotshots, they would be earning high returns, they would be millionaires, and their principal investment would never be touched. Count 1 of the Bill of Particulars indicates that on December 7, 2001, appellant committee aggravated theft by deception in violation of R.C. 2913.02 when he deprived the Kerrs of $100,000, by making the same representations, and by issuing a promissory note for repayment in installments of $6,000. Count 15 of the Bill of Particulars indicates appellant committed aggravated theft by deception in violation of R.C. 2913.02 when he deprived FNB of in excess of $1.5 million by depositing bad checks.
 {¶ 86} We find merit in appellant's argument as it relates to Counts 1 and 2 of the indictment. Theft counts in an indictment that are part of an interrelated series of crimes committed in an ongoing relationship with the same victims must be tried as a single offense. R.C.2913.61(C)(1); State v. Rice (1995), 103 Ohio App.3d 388, 402. The record indicates appellant committed and facilitated both of these theft offenses in his continuing relationship with the Kerrs. While the crimes occurred on separate occasions, they were interrelated and committed by the same offender against the same victims. Despite appellant's failure to raise the applicability of R.C. 2913.61(C)(1) at trial, the failure to merge Counts 1 and 2 into a single offense constitutes plain error, as the error affects a substantial right and the outcome of appellant's trial would have been different, but for the error. See Crim.R. 52(B);State v. Moreland (1990), 50 Ohio St.3d 58, 62.
 {¶ 87} With respect to appellant's assignment of error as it relates to Count 15, R.C. 2913.61(C) does not require theft offenses as part of a common course of conduct to defraud different victims to be tried as one offense. See R.C. 2913.61(C)(2). Since the victim alleged in Count 15 of the indictment is FNB, there was no error in failing to merge that count with the theft offenses against the Kerrs. Appellant's second assignment of error is sustained in part and overruled in part.
 {¶ 88} Assignment of Error No. 5:
 {¶ 89} "THE TRIAL COURT ERRED IN ITS SENTENCING OF THE APPELLANT TO MULTIPLE, CONSECUTIVE, AND MORE-THAN-MINIMUM SENTENCES."
 {¶ 90} First, appellant argues the trial court erred in imposing multiple consecutive, nonminimum sentences for the same conduct. We disagree.
 {¶ 91} R.C. 2941.25, Ohio's allied offense statute, protects against multiple punishments for the same criminal conduct, which could violate the Double Jeopardy Clauses of the United States and Ohio Constitutions. R.C. 2941.25 provides, as follows:
 {¶ 92} "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 {¶ 93} "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where this conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
 {¶ 94} When considering whether offenses are of similar import under R.C. 2941.25(A), a court must compare the statutorily defined elements of the offenses and determine whether they "correspond to such a degree that the commission of one crime will result in the commission of the other."State v. Rance, 85 Ohio St.3d 632, 639, 1999-Ohio-291, quoting State v.Jones, 78 Ohio St.3d 12, 13, 1997-Ohio-38.
 {¶ 95} Appellant's argument with respect to Counts 1 and 2 is rendered moot, based on our resolution of appellant's second assignment of error. Counts 16-23 are based on appellant's separate acts of writing and depositing separate checks in the FNB and 5/3 accounts, and each act is a separate violation of R.C. 2913.11(A). In addition, Counts 4, 5, 6, 7, 8, 11, and 12 are based on separate misrepresentations appellant made to the Kerrs, and are separate violations of R.C. 1701.44(B)(4). Count 15 is based on the collective theft of funds from FNB and 5/3, which is a separate offense. Count 3 is not an allied offense of similar import, because the elements of money laundering are not similar such that the commission of that offense results in the commission of the other crimes for which appellant was convicted.
 {¶ 96} Our review of the record indicates the trial court did find that Counts 9 and 13, and Counts 10 and 14 are allied offenses of similar import, and merged them. According to the trial court, "[t]he defendant will only be convicted and sentenced on Count 9, not 13, on Count 10, and not 14."
 {¶ 97} Next, appellant argues the trial court erred in failing to provide reasons for imposing nonminimum and consecutive sentences. We disagree.
 {¶ 98} R.C. 2929.14(B) states: "[e]xcept as provided in division (C) * * * of this section, * * * if the court imposing a sentence upon an offender for a felony elects or is required to impose a prison term on the offender, the court shall impose the shortest prison term authorized for the offense pursuant to [R.C. 2929.14(A)], unless one or more of the following applies:
 {¶ 99} "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
 {¶ 100} "(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 101} Ohio's sentencing guidelines generally disfavor maximum sentences and favor minimum sentences for offenders who have no history of imprisonment. See State v. Edmonson, 86 Ohio St.3d 324, 1999-Ohio-110. R.C. 2929.14(B) requires a sentencing court to sentence a first offender to the shortest term authorized unless the court finds, that either: (1) the shortest prison term will demean the seriousness of the offender's conduct; or (2) the shortest prison term will not adequately protect the public from future crime by the offender or by others. The sentencing court must make these findings on the record at the sentencing hearing, but the court is not required to give reasons for its findings.Edmonson, 86 Ohio St.3d at 326.
 {¶ 102} R.C. 2929.14(E)(4) permits a trial court to impose consecutive terms of imprisonment provided the court makes each of the following three findings: (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) consecutive terms are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) that one of the following factors listed in R.C. 2929.14(E)(4)(a) through (c) applies:
 {¶ 103} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to [R.C. 2929.16, R.C. 2929.17, or R.C. 2929.18], or was under post-release control for a prior offense;
 {¶ 104} "(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct;
 {¶ 105} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 106} In imposing consecutive sentences, the sentencing court must make the statutorily enumerated findings and give reasons supporting those findings at the sentencing hearing. State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165, paragraph one of the syllabus.
 {¶ 107} After reviewing the record, we find the trial court did give reasons for its findings to support both nonminimum and consecutive sentences. At the sentencing hearing, the trial court stated on the record:
 {¶ 108} "In terms of sentencing factors, the Court will have to consider recidivism factors. The defendant, as set forth in the presentence investigation report, has a rather extensive prior record. The record includes charges of passing bad checks, as well as other charges. So we'll find that the recidivism factors are increased by virtue of defendant's prior record. We'll further find that the defendant has failed to respond favorably in the past to sanctions imposed in conjunction with his criminal convictions. And further find that the defendant shows no genuine remorse. * * * I don't think [the defendant] is capable of any compassion or of any remorse for the rights or interest of * * * people other than himself. * * * It is my opinion that as soon as the defendant is released from custody, whatever day that will occur, that he's incapable of being rehabilitated * * * and that whatever day he's released, I'm confident that * * * his first movement will be to begin a scheme and begin defrauding or stealing from others. * * * And it is a huge concern by the court that this defendant, if not incarcerated, will victimize others and will commit [new] and future offenses."
 {¶ 109} Further, the court found:
 {¶ 110} "The victims in this case have suffered significant economic harm. * * * The numbers involved in this case speak to [its] seriousness and speak quite frankly to the talents of Mr. Copeland, and what a huge waste it is for a man who has such a wonderful mind to be able to set this scheme in place, to work this scheme, to defraud very intelligent people, to defraud banks that have their own security staffs and procedures in place to avoid that. * * * I'll find that the defendant held a position of trust, [and] that the offense related to that position of trust. That position obligated the defendant to prevent the offense from occurring and he failed to do so. I don't believe that the testimony was ever [that] any of these actions were [ever] motivated by the defendant to go into the restaurant business. I think the only interest and the only motivation for the defendant was self-interest, monetary gain to purchase his house, [and] to purchase the car that [he] drive[s]."
 {¶ 111} The court went on to find:
 {¶ 112} "In this case, to impose the shortest term of imprisonment on the defendant would demean the seriousness of his conduct and not adequately protect the public. For all the reasons I've already elaborated I would incorporate everything that was said in this sentencing proceeding and that I relied on in this sentencing proceeding thus far in support of that finding. The record will support that to impose simply the minimum sentence, the shortest term of imprisonment would demean the seriousness of the defendant's actions [a]nd would not adequately protect the public. The defendant will recidivate upon release, I believe, immediately. I believe that the plan will more likely than not be prepared mentally while the defendant is serving his time. * * * These peoples' lives have been destroyed and to impose a minimum sentence on Mr. Copeland is not justice and it is inconsistent with the purposes and principles of sentencing. This Court feels that any presumption in that regard is overcome and that finding that the facts and information before the Court support that finding * * *.
 {¶ 113} "We'll further find that consecutive sentences * * * will not be disproportionate. And we'll further find that the harm is so great or unusual that a single term does not adequately reflect the seriousness of the defendant's conduct and will further find that the defendant's criminal history shows that consecutive terms are needed to protect the public. Again, the Court will incorporate by reference and will not repeat all of the findings that I've made and all the information that I relied on as previously referenced. I'll incorporate that in those findings and in support of those findings."
 {¶ 114} Next, appellant maintains imposing nonminimum and consecutive sentences pursuant to R.C. 2929.14(B)(2) is unconstitutional and violates the rule set forth in Blakely v. Washington, (2004), 542 U.S. 296,124 S.Ct. 2531. This court has previously held that the findings a sentencing court makes pursuant to R.C. 2929.14(B) in imposing maximum or nonminimum sentences do not violate Blakely, because those findings act to limit the sentence the court may impose within the statutory range authorized in R.C. 2929.14(A). State v. Combs, Butler App No. CA2000-03-047, 2005-Ohio-1923, ¶ 58; State v. Farley, Butler App. No. CA2004-04-085, 2005-Ohio-2367, ¶ 43. Further, the findings required under R.C. 2929.14(E)(4) for imposing consecutive sentences do not violate Blakely. State v. Borders, Clermont App. No. CA2004-12-101, 2005-Ohio-4339, ¶ 15.
 {¶ 115} Finally, appellant argues the imposition of a 23-year prison sentence, as well as fines of $216,500 and restitution of $868,381.68 is unreasonable, and that the court did not consider appellant's ability to pay the financial sanctions as required by R.C. 2929.19(B)(6). However, appellant's argument is unfounded.
 {¶ 116} R.C. 2929.18 authorizes a trial court to impose financial sanctions upon felony offenders. The imposition of fines is within the sound discretion of the trial court, and will not be reversed absent an abuse of discretion. See State v. Stevens (1992), 78 Ohio App.3d 847,851. A trial court abuses its discretion when it fails to consider whether a defendant will be able to pay an imposed fine without undue hardship as required by 2929.19(B)(6).
 {¶ 117} At the sentencing hearing, the trial court found, on the record:
 {¶ 118} "Now, with respect to the fines and the financial sanctions that are going to be imposed today, I've considered the defendant's resources and the defendant's ability to pay both now and in the future. The defendant is a resourceful individual. I'm not certain that anyone is absolutely sure what the extent of his resources are or may be, but it does appear that upon the defendant's release from prison he will be capable of engaging in productive endeavors if he so chooses and that he will be capable of meeting the financial obligations imposed upon him."
 {¶ 119} Appellant's fifth assignment of error is overruled.
 {¶ 120} The judgment of the trial court is affirmed in part and reversed in part. We overrule appellant's first, third, fourth, and fifth assignments of error. We overrule in part and sustain in part appellant's second assignment. The judgment of the trial court is reversed with respect to the convictions on Counts 1 and 2, and this cause is remanded with instructions to merge the two theft offenses and to enter judgment accordingly.
 {¶ 121} Judgment affirmed in part, reversed in part, and cause remanded.
Walsh, P.J., and Young, J., concur.
[1] While appellant was convicted of passing bad checks in violation of R.C. 2913.11(A), the General Assembly has renumbered R.C. 2913.11(A) such that it now exists as 2913.11(B).