[Cite as *State v. Mahone*, 2014-Ohio-1251.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellee,                :          No. 12AP-545
                                (C.P.C. No. 11CR-08-4337)

v.                                               :

                                      (REGULAR CALENDAR)

Alicia K. Mahone,                                :

      Defendant-Appellant.               :

---

D E C I S I O N

Rendered on March 27, 2014

---

*Michael DeWine*, Attorney General, and *Daniel H. Huston*, for appellee.

*Yeura R. Venters*, Public Defender, and *Emily L. Huddleston*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Alicia K. Mahone, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding her guilty of grand theft, theft, and falsification in a theft offense.

{¶ 2} On August 16, 2011, appellant was indicted on one count of grand theft, in violation of R.C. 2913.02(A)(3), one count of theft, in violation of R.C. 2913.02(A)(3), and two counts of falsification in a theft offense, in violation of R.C. 2921.13(A)(9). The indictment arose out of an investigation by the Health Care Fraud Section of the Office of

the Ohio Attorney General into the billing practices of appellant, a home health aide, for reimbursement claims submitted for services to Medicaid recipients.

{¶ 3}  The matter came for trial before a jury beginning March 5, 2012.  The first witness to testify on behalf of plaintiff-appellee, the state of Ohio, was Rosemary Walton, employed by the Ohio Department of Job and Family Services ("ODJFS") as a compliance manager for the Ohio Home Care Program ("OHC").  Under the OHC waiver program, Medicaid eligible individuals with "high level" needs (and who might otherwise risk placement in a nursing home or hospital) receive home care services.  (Tr.  Vol. I, 85.)

{¶ 4}  Qualified providers of home health services include agency and non-agency providers.  Non-agency providers are also known as "independent providers."  (Tr. Vol. I, 86.)  A "personal care" or "home health" aide is one type of non-agency provider.  (Tr. Vol. I, 87.)  Home health aides perform services for clients such as bathing, dressing, grooming, laundry, and cleaning.  Independent providers utilize an "All Services Plan" that documents goals and objectives based on the assessed needs of the client.  (Tr. Vol. I, 89.)

{¶ 5}  Medicaid pays only for services actually rendered.  In order to receive reimbursement, an independent provider is required to maintain clinical records, i.e., written documentation that includes the services provided, as well as arrival and departure times.  The billing system for Medicaid reimbursement utilizes billing codes and providers submit claims for payment based on 15-minute units.

{¶ 6}  Individuals seeking to become Medicaid service providers submit to an application process; upon meeting eligibility, ODJFS assigns to a provider a seven-digit provider number for billing purposes.  At trial, Edward Zachrich, supervisor of the Provider Enrollment Unit at ODJFS, identified appellant's application and provider agreement.

{¶ 7}  A provider has the option of either billing directly to the state or utilizing a third-party billing service.  Appellant's billing was handled by a third-party service, Dyserv, a Columbus based medical billing company that has a provider agreement with ODJFS.  Dyserv processed Medicaid claims from information provided by appellant, which it then transmitted to ODJFS.

{¶ 8}   ODJFS processes Medicaid claims for the state.  During the period from 2007 to 2011, ODJFS utilized the "Medicaid Management Information System" for processing the payment of Medicaid claims.  (Tr. Vol. I, 148.)  Deonne Clark, an administrative officer with ODJFS, testified that the term "fee for service" describes "a price that is given to a procedure" with respect to a patient; reimbursement occurs after a provider submits a fee claim. (Tr. Vol. I, 149.)  During 2010 and 2011, appellant received payment under the fee for services system as an independent provider.

{¶ 9}   ODJFS relies on the provider for submission of claims.  Payments made to a particular provider appear on a remittance advice report, which summarizes all claims submitted by the provider during the previous week.  A remittance advice contains information that includes the provider's name, address, and provider number, the recipient of services, the procedure code, the amount billed, the amount allowed for payment, and the amount paid to the provider.  ODJFS issues remittance advice to providers on a weekly basis.  At trial, the state offered as exhibits various remittance advice reports for services by appellant involving Medicaid recipients Samuel, Marion Hart, James Eiben, and Pamela Kasunic.  Clark, a custodian of those records, identified appellant's seven-digit provider number and also identified the billing number for Medicaid recipient Samuel.

{¶ 10} Thomas Holsinger, an employee of the Office of Budget and Management ("OBM"), testified that one of the duties of OBM is to pay claims submitted to the state for services rendered by providers.  OBM maintains electronic records of payments, and Medicaid providers are paid through the use of an electronic fund transfer ("EFT").    At trial, Holsinger identified state's exhibit D as a direct deposit EFT form for Medicaid payments to appellant.

{¶ 11} Joseph C. Pledger is retired and the brother of Samuel.  Samuel passed away on January 4, 2012 at the age of 63.  Prior to his death, Samuel resided in an apartment building, the Notre Dame Apartments located at 1325 Angel Road, Cleveland.  He moved into the apartments in September 2009, and his one-bedroom apartment was located on the third floor of the building.  In 2010, Samuel was taking medication for diabetes.  Prior to moving into the apartment building, he received assistance with cooking and errands from a home health aide, Brenda Campbell.

{¶ 12} The apartment complex has a security desk and visitors are required to sign in and out.  When visiting his brother, Joseph would indicate on the sign-in sheet the apartment number.  Joseph testified that a security officer was there "most times unless they had to go away for a round or some other business."  (Tr. Vol. II, 58.)

{¶ 13} Joseph was not familiar with appellant and testified that he "never met her." (Tr. Vol. II, 56.)  In December 2010, after his brother was admitted to the hospital, Joseph received a call from "a young lady," indicating she was Samuel's aide.  The woman stated she was "looking for a black book."  (Tr.  Vol. II, 56.)  Joseph returned the call and told the woman he "didn't see a black book."  (Tr. Vol. II, 56.)  The woman told him "they had found it."  (Tr. Vol. II, 56.)  At trial, Joseph testified he did not remember ever seeing appellant at his brother's apartment.

{¶ 14} Sherina Pledger, age 21, is a nursing assistant and the niece of Samuel. Sherina is also a student at Lorraine Community College.  While on break from college, Sherina occasionally would stay with her uncle at the Notre Dame Apartments.  Upon entering the apartment complex, she would sign in and then "go to the * * * number keypad and you get buzzed."  (Tr. Vol. II, 81.)  Sherina would sign her name, noting the time and apartment number she was visiting; she was also required to sign out.

{¶ 15} Sherina did not recall any home health aides assisting her uncle during the period of April through December 2010.  Prior to that time, Sherina recalled a home health aide named Brenda Campbell who assisted her uncle, including during the time he resided at the Notre Dame Apartments.  Sherina was not familiar with appellant.  Samuel once told her "he was getting an aide," but that was the only time they had such a discussion. (Tr. Vol. II, 96.)

{¶ 16} Tamara Washington is the property manager for the Notre Dame Apartments, a 74-unit building.  In order to reside at the apartment, an individual must be at least 55 years of age.  Washington was familiar with Samuel, who resided in room No. 314.  According to Washington, he was able to function independently.  Samuel moved into the apartment building in September 2009 and remained there until December 2010, when he entered a hospital due to illness.

{¶ 17} At trial, Washington identified sign-in sheets and security log sheets for the apartment building.  Visitors entering the building are required to sign in at the front

desk.  On weekdays, a receptionist is at the front desk from 7:00 a.m. until 3:00 p.m., while security guards cover the front desk during the remaining hours.  Washington testified that she was not familiar with appellant and had never observed her at the apartment building.

{¶ 18}  The state also called four individuals, Darryn Vinson, Dietrich Gandy, Jevon Slone, and David Smith, all employed as security officers at the Notre Dame Apartments. Each of these witnesses testified they were not familiar with appellant.

{¶ 19}  Todd Chambers is a special agent with the Office of the Ohio Attorney General, Health Care Fraud Section, assigned to the Medicaid Fraud Control Unit; the unit responsible for investigating allegations of Medicaid fraud within the state.  Agent Chambers began his investigation of appellant's billing practices after receiving information regarding a Medicaid recipient (Samuel) who resided at the Notre Dame Apartments.  Due to Samuel's admission to a hospital on December 7, 2010, Agent Chambers was unable to interview him as part of the investigation.

{¶ 20}  Agent Chambers initially reviewed the All Services Plan for Samuel to ascertain appellant's hours of service; the plan also referenced another patient care attendant, Brenda Campbell.  In January 2011, Agent Chambers contacted the manager of the Notre Dame Apartments and requested copies of sign-in and sign-out sheets used at the apartment building; the state introduced those documents at trial.  The agent reviewed the sign-in logs to determine "whether or not [appellant] was actually providing services to Mr. Pledger."  (Tr. Vol. III, 24.)  In examining the records for Samuel during the time period of April 11 through December 6, 2010, Agent Chambers could not find any sign-in or sign-out information containing appellant's name.  He then examined appellant's billing information and determined appellant was "billing five, seven days a week, five hours a day for the most part of all her billings."  (Tr. Vol. III, 24.)

{¶ 21}  Agent Chambers subsequently contacted appellant by telephone and arranged a meeting to interview her.  On March 30, 2011, Agent Chambers and Agent Greg Mount interviewed appellant at the Cleveland Public Library, a location chosen by appellant.  They met with her in a conference room of the library, and the agents recorded the interview, which lasted approximately one hour.  Agent Chambers informed appellant

that he wanted to discuss "the services she was providing to Medicaid recipient Samuel Pledger." (Tr. Vol. III, 32.)

{¶ 22} During the interview, Agent Chambers discussed with appellant the apartment's sign-in and sign-out sheets. He showed her sign-in sheets for the month of June and asked her to explain why her name did not appear on any of the sheets. Appellant's "explanation changed * * * as to why her name was not on the sheet." (Tr. Vol. III, 38.) She initially stated she had "signed in during daytime hours" and that "she never signed in during nighttime hours because she knew the guards and they weren't there." (Tr. Vol. III, 38.) Appellant also stated that "she had a key card" and that she would wait until she did not see any guards "and that is when she could go in." (Tr. Vol. III, 38.) Appellant additionally told the agents she signed in under a different name. Agent Chambers noted that "her explanation changed several times." (Tr. Vol. III, 38.) At one point in the interview, appellant explained that "the whole thing was bogus" and that "she didn't want to sign her name on the line because she [did not] want her name to be involved in all this mess." (Tr. Vol. III, 38.)

{¶ 23} The All Services Plan for Samuel authorized 35 hours per week of home health aide services, and the plan referenced typical service time from 12:00 a.m. to 5:00 a.m. At the beginning of the interview, appellant "claimed that she worked one night from 12 p.m. to 5 a.m.," but that on four other nights she worked from 11:00 p.m. until 4:00 a.m. (Tr. Vol. III, 39.) Appellant initially told the agents "she worked all the time. She then told me she worked five of seven days." (Tr. Vol. III, 40.) During the interview, when the agents questioned her further about the actual number of hours per week she provided services for Samuel, appellant "went from * * * saying she worked only 10 hours" to stating "that she actually worked 15 hours." (Tr. Vol. III, 40.)

{¶ 24} Agent Chambers informed appellant that the agents were aware of a "kickback scheme with [Brenda] Campbell." (Tr. Vol. III, 42.)[1] The agent explained that "the provider does not show up to work, and they pay the consumer Medicaid recipient * * * either money or other items * * * in lieu of not working for them." (Tr. Vol. III, 42.) Appellant denied ever paying money to Samuel for not working the designated hours.

---

[1] As a result of the investigation, the state also filed charges against Brenda Campbell.

{¶ 25} Agent Chambers testified that appellant admitted, during the interview, to not working all of the hours she was billing. Specifically, "in reference to the 35 hours a week that she was supposedly working," appellant told the agents "she would give us twenty [hours] that she didn't work if we would give her 15 hours that they did credit for working 15 hours." (Tr. Vol. III, 44.) Appellant indicated she was under stress due to a financial bind. At trial, the state played an audiotape of the interview between the agents and appellant.

{¶ 26} After the interview with appellant, Agent Chambers reviewed appellant's billing and payment information related to services for Samuel; the agent determined that the total billing amount for this Medicaid recipient was $19,022.35. Giving appellant credit for working 15 out of every 35 hours, Agent Chambers calculated that the total amount appellant billed for hours she did not actually work was $10,842.74.

{¶ 27} The investigation revealed that appellant had also submitted billing for services to three other Medicaid recipients. In June 2010, Agent Chambers contacted appellant and asked to meet with her again to discuss those individuals. When Agent Chambers arrived for the interview, appellant "appeared to be very stressed." (Tr. Vol. III, 120.) Appellant was upset and walked over to the agent's vehicle before they could go inside the library. They spoke for approximately ten minutes, but Agent Chambers was unable to persuade appellant to go inside the library to conduct the interview. Appellant did, however, provide the agent with documents at that time.

{¶ 28} The documents contained provider information setting forth the dates and times appellant indicated she worked for Medicaid recipients Marion Hart, Pamela Kasunic, and James Eiben. Agent Chambers "took each one of the sheets" and "put in the date that [appellant] claimed she worked." (Tr. Vol. III, 123.) He then "put in the hours for the times she worked," and "completed an access table for each individual." (Tr. Vol. III, 123.) The agent then ran a computer program to perform a "comparison to see if any of them overlapped." (Tr. Vol. III, 123.) At trial, he identified a total of 19 instances in which appellant submitted billing for overlapping time periods.

{¶ 29} The first witness for appellant was Carolyn Pollard, appellant's aunt. Pollard testified that she assisted appellant in filling out some of her billing documents;

appellant needed Pollard's assistance because she "wanted to get her paperwork in order so she could read it." (Tr. Vol. III, 307.)

{¶ 30} Naomi Brown, a friend of appellant's, testified that she sometimes accompanied appellant to Samuel's apartment. According to Brown, "[m]ost of the time I sat in the van. But on two occasions I went upstairs with her." (Tr. Vol. IV, 39.) Brown would assist appellant with groceries. Brown testified that "we normally wouldn't be there but a few minutes." (Tr. Vol. IV, 44.)

{¶ 31} Appellant, a licensed practical nurse, testified on her own behalf. In 2008, she served as a back-up aide to Samuel for one week. In 2010, appellant contacted a case manager and learned that she was still on Samuel's case plan. The case manager indicated "if he didn't find a provider he was going to lose his waiver." (Tr. Vol. IV, 92.) Appellant contacted Samuel, who told her that he needed an aide. Appellant began working for him, and took him to appointments. At trial, she identified her name on one of the apartment's visitor sign-in sheets.

{¶ 32} Appellant testified that she received a swipe card for the apartment building from Samuel. According to appellant, the woman who worked the front desk during the daytime hours did not require individuals to sign in or sign out. She also testified that the security guards did not require her to sign in or sign out because "they knew who I was." (Tr. Vol. IV, 109.)

{¶ 33} On a typical day, appellant would visit Samuel in the morning to make sure he took his insulin. She would then "go to work for * * * other clients, and then * * * go back." (Tr. Vol. IV, 119.) Appellant would take him to the store or for physician appointments, and sometimes they would go out for lunch. Appellant denied that Samuel ever asked her for money.

{¶ 34} During direct examination, defense counsel asked appellant about her interview with Agent Chambers at the public library. Appellant explained that she used the term "bogus" to mean "just out of the norm." (Tr. Vol. IV, 164.) Appellant further explained that her statement, "[g]ive me 15 hours" and "I will give you all twenty," meant she was spending 15 hours in the apartment and "twenty hours in the community." (Tr. Vol. IV, 173.)

{¶ 35} Following the presentation of evidence, the jury returned verdicts finding appellant guilty of all four counts of the indictment. For purposes of sentencing, the trial court merged Counts 1 and 2, as well as Counts 3 and 4. By judgment entry filed May 29, 2012, the trial court sentenced appellant to five years of community control on Counts 1 and 3 and ordered her to pay restitution.

{¶ 36} On appeal, appellant sets forth the following six assignments of error for this court's review:

> First Assignment of Error: As to counts three and four, the court erroneously overruled the defense motion for acquittal made pursuant to Criminal Rule 29 at the close of the state's case in chief.
>
> Second Assignment of Error: The evidence is legally insufficient to support convictions on count three or merged count four.
>
> Third Assignment of Error: Conviction of theft as charged in count three, and falsification as charged in merged count four is against the manifest weight of the evidence.
>
> Fourth Assignment of Error: The evidence is legally insufficient to support convictions on count one and or merged count two.
>
> Fifth Assignment of Error: Conviction of theft as charged in count one, and falsification as charged in merged count two is against the manifest weight of the evidence.
>
> Sixth Assignment of Error: By operation of R.C. 2913.61(C)(1) counts one and three constitute a single offense, and thus merge for purposes of sentencing.

{¶ 37} Appellant's first, second, and third assignments of error are interrelated and will be considered together. These assignments of error all raise challenges to the verdicts rendered under Counts 3 and 4, charging appellant with theft and falsification in a theft offense regarding billing for services provided to Medicaid recipients Marion Hart, Pamela Kasunic, and James Eiben. Under the first assignment of error, appellant argues the trial court erred in overruling defense counsel's motion for acquittal pursuant to Crim.R. 29. Under the second and third assignments of error, appellant argues that her

convictions under Counts 3 and 4 are not supported by sufficient evidence and are against the manifest weight of the evidence.

{¶ 38} Crim.R. 29(A) states in part: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."  Under Ohio law, "[a] motion for acquittal at the close of the state's case tests the sufficiency of the evidence."  *State v. Miley*, 114 Ohio App.3d 738, 742 (4th Dist.1996).  Further, "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence."  *State v. Tenace,* 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.  In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "  *Id.*, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 39} In contrast to an assessment of the sufficiency of the evidence, an appellate court, in considering a manifest weight challenge, "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Vasquez*, 10th Dist. No. 13AP-366, 2014-Ohio-224, ¶ 49.  Further, "[t]he power to reverse a judgment of conviction as against the manifest weight must be exercised with caution and only in the rare case in which the evidence weighs heavily against the conviction."  *State v. Scott,* 8th Dist. No. 97676, 2012-Ohio-3811, ¶ 13, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 40} R.C. 2913.02(A)(3) defines theft by deception and states in part: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." Deception is defined under R.C. 2913.01(A) as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission

that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." Pursuant to R.C. 2901.22(B), "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2921.13(A)(9) defines falsification in a theft offense and provides in part: "No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a false statement previously made, when * * * [t]he statement is made with purpose to commit or facilitate the commission of a theft offense."

{¶ 41} As noted, Counts 3 and 4 alleged theft and falsification in a theft offense with respect to appellant's billing for Medicaid recipients Hart, Kasunic, and Eiben. Appellant argues that these three individuals did not testify at trial, and she maintains there was insufficient evidence by which a juror could return a finding of guilt beyond a reasonable doubt as to those counts.

{¶ 42} The state's theory of the case as to Counts 3 and 4 was that appellant submitted fraudulent billings for overlapping services with respect to these three Medicaid recipients, i.e., that she billed and received payments for two services allegedly performed at the same time. According to the state, ODJFS overpaid appellant in the amount of $1,127.56 due to improper billing. At trial, the state relied upon the testimony of Agent Chambers, as well as documentation the agent obtained from appellant, to support its theory that she billed for overlapping dates/times of service.

{¶ 43} Agent Chambers testified that he received provider documentation from appellant regarding "the days, the dates and the times" she worked for Medicaid recipients Hart, Kasunic, and Eiben. (Tr. Vol. III, 122.) The agent entered this information into a computer program and ran a "comparison to see if any of them overlapped." (Tr. Vol. III, 123.) At trial, the agent identified state's exhibits C-1 through C-9 as remittance advice documents for Medicaid recipients Kasunic, Hart, and Eiben, including the dates and units for services billed. Agent Chambers identified state's exhibit F as a document he generated titled "Crossover Billings." (Tr. Vol. III, 126.) That document included the recipient's name, service date, amount paid, and unit number, as well as the name and information of the "crossover person." (Tr. Vol. III, 127.)

{¶ 44} By way of example, Agent Chambers identified state's exhibit F-1 as clinical notes for recipient Hart for services listed by appellant on January 13, 2010.  Appellant's clinical notes indicate she arrived at the client's home at 10:00 a.m. and performed services from 10:00 a.m. until 2:00 p.m.  That exhibit also contained a nursing visit note for another recipient, Kasunic, in which appellant indicated she provided services for this client on the same date (January 13, 2010) beginning at 9:00 a.m. and ending at 1:00 p.m.  Agent Chambers identified the period of overlap (between 10:00 a.m. and 1:00 p.m.), and he testified that the overlap indicated "12 units [appellant] shouldn't have been paid."  (Tr. Vol. III, 131.)

{¶ 45} Agent Chambers testified that his investigation revealed a total of 19 separate occasions in which appellant submitted billing for overlapping services, identified as occurring on the following dates: January 13, 15, 18, 20, 22 and 25, 2010, February 1 and 3, 2010, May 6, 11, 13, 15, 18, 20, 22, 25 and 27, 2010, and January 11 and 13, 2011.  According to Agent Chambers, the overlap in billing totaled $1,127.56.  The agent also testified that the Medicaid recipients at issue did not live in close proximity to one another and that it was not possible for appellant to have performed services for these individuals at the same time.

{¶ 46} Construing the evidence presented most strongly in favor of the state, as we are required to do in considering a sufficiency challenge, a jury could reasonably infer that appellant knowingly obtained control of monies by deception by submitting false billing claims for overlapping periods of time.  As noted, Agent Chambers, who testified that he obtained the billing documentation directly from appellant, entered that data into a computer program, including dates and times appellant represented as having provided services for the Medicaid recipients at issue.  The agent's review of that information revealed 19 instances in which appellant submitted billing for overlapping periods of time.  The state also presented evidence that it was physically impossible for appellant to have performed the services for these Medicaid recipients at the same time.  The state also presented evidence by which the trier of fact could conclude that appellant received overpayments in the amount of $1,127.56 as a result of improper billing.  Upon review,

there was sufficient evidence to support the convictions under Counts 3 and 4, and the trial court did not err in denying appellant's motion for judgment of acquittal.[2]

{¶ 47} As to her manifest weight challenge, appellant's primary contention is that the state did not present direct evidence of false billing with respect to Medicaid recipients Hart, Eiben, and Kasunic. Appellant maintains it is reasonable to assume the overlapping hours were merely the result of careless bookkeeping, and she urges caution in considering a conviction based upon "weak" circumstantial evidence.

{¶ 48} Under Ohio law, however, "circumstantial evidence can have the same probative value as direct evidence, and '[a] conviction can be sustained based on circumstantial evidence alone.' " *State v. Fausnaugh*, 10th Dist. No. 11AP-842, 2012-Ohio-4414, ¶ 26, quoting *State v. Franklin*, 62 Ohio St.3d 118, 124 (1991). Relevant to the charges herein, this court has previously recognized that, "absent an admission of guilt by the defendant, or 'the testimony of one no less closely associated with the appellant than his shadow,' certain elements of the alleged crime of theft by deception can only be proved by circumstantial evidence." *State v. Blankenship,* 10th Dist. No. 80AP-221 (Jan. 22, 1981), citing *State v. Graven,* 54 Ohio St.2d 114 (1978).

{¶ 49} As noted, the state's evidence included appellant's own billing documentation that reflected overlapping times for services provided to two clients, as well as testimony by Agent Chambers that it was physically impossible for her to have provided services for these recipients at the same time. While appellant suggests mere bookkeeping error, the state presented evidence as to repeated (19) incidents in which appellant billed for concurrent, overlapping time periods. It was within the province of the jury to consider the probative value of this evidence, whether direct or circumstantial, and to draw reasonable inferences from the facts and testimony in evidence. *State v. Spikes,* 9th Dist. No. 05CA008680, 2006-Ohio-1822, ¶ 21, citing *State v. Group,* 98 Ohio St.3d 248, 2002-Ohio-7247. Upon review, we find that the jury did not lose its way and create a manifest injustice in finding appellant guilty of Counts 3 and 4. Accordingly, her convictions are not against the manifest weight of the evidence.

---

[2] As noted under the facts, the trial court merged Counts 3 and 4, and the state elected to sentence appellant on Count 3, i.e., theft.

{¶ 50} Based upon the foregoing, appellant's first, second, and third assignments of error are without merit and are overruled.

{¶ 51} Appellant's fourth and fifth assignments of error are interrelated and we will address them together. Under these assignments of error, appellant challenges her convictions under Counts 1 and 2 as not supported by sufficient evidence and as against the manifest weight of the evidence. We initially consider appellant's sufficiency argument. Under this assignment of error, appellant cites the fact that investigators never interviewed Samuel, nor did they interview, or call as a witness, the daytime receptionist at the Notre Dame Apartments.

{¶ 52} As noted under the facts, the state presented various witnesses who provided testimony in connection with the Notre Dame Apartments during the time Samuel was a resident. Tamara Washington, the property manager, testified as to the visitor sign-in process at the apartment building, and she identified the sign-in documents provided to the investigator. Washington was not familiar with appellant and had never observed her at the apartment complex. The state also called as witnesses four security guards who worked at the Notre Dame Apartments; each of these witnesses testified they were not acquainted with appellant. Samuel's niece, Sherina, who sometimes resided with Samuel at the apartment, testified that she had never met appellant. Joseph, Samuel's brother, similarly testified that he visited his brother at the apartment complex, but he had never met appellant.

{¶ 53} Agent Chambers provided testimony regarding the investigation, including his interview of Washington and his review of the sign-in documents at the apartment complex. The agent indicated that he found no sign-in signatures with appellant's name. He also reviewed appellant's billing information to determine whether she actually provided services for the dates she sought reimbursement. According to his review, appellant was routinely billing five hours a day, seven days a week, during the time period in question.

{¶ 54} Agent Chambers and another investigator subsequently interviewed appellant. During the interview, appellant's explanation "changed" when questioned as to why her name did not appear on any of the sign-in sheets. (Tr. Vol. III, 38.) When the agent asked appellant why she signed in under a different name, she explained that "the

whole thing was bogus," and that "she didn't want to sign her name on the line because she [did not] want her name to be involved in all this mess."  (Tr. Vol. III, 38.)  Agent Chambers interpreted appellant's explanation of bogus to mean that "[she] wasn't showing up for the hours, therefore this stuff was bogus, she didn't want her name to get caught in the mess she was involved in."  (Tr. Vol. III, 38-39.)  When further questioned about the number of hours she actually worked, appellant told the agents: "[I]f you give me 15 hours I will give you twenty hours that I didn't work."  (Tr. Vol. III, 40.)  Appellant told Agent Chambers that she was under stress because she was in a financial bind.

{¶ 55} At trial, the state played an audiotape of the interview between investigators and appellant.  During the interview, appellant stated she did not want to lose her license and that she would "pay them back all this."  (Tr. Vol. III, 67.)   Appellant "felt it was bogus, it was all shady, that's why I was trying to get somebody else to take this case.  I didn't want to, it is too much."  (Tr. Vol. III, 68.)  Appellant told the agents she worked five out of the seven days reported.  Appellant acknowledged that, in the month of June, she "didn't go in the building."  (Tr. Vol. III, 71.)

{¶ 56} Appellant told the agents she was at the apartment "five days out of the week.  I am not saying I did five hours out of the day."  (Tr. Vol. III, 73.)  According to appellant, "[o]ut of 35 hours, I did at least twenty of them."  (Tr. Vol. III, 73.)  When pressed as to how many hours she actually worked, appellant responded: "Give me 15, I will give you all 20."  (Tr. Vol. III, 75.)  When questioned further about how many hours per week she worked from April to December 2010, appellant replied: "10 hours, I'm just going to say 10 hours a week I did."  (Tr. Vol. III, 78.)  She later stated she worked "15 hours out of 35."  (Tr. Vol. III, 79.)  Appellant indicated she "was in a bind, in a financial crisis."  (Tr. Vol. III, 80.)  According to appellant, Samuel would sign the sheets for an entire week all at one time.

{¶ 57} Following his interview with appellant, Agent Chambers obtained appellant's billing and payment information with respect to Medicaid recipient Samuel.  The investigator calculated a total billing amount of $19,022.35 and calculated a fraud finding of $10,842.74 based upon appellant's admission that she worked 15 of the 35 hours billed.

{¶ 58} We have previously noted the elements of theft by deception, pursuant to R.C. 2913.02(A)(3), and falsification in a theft offense as defined by R.C. 2921.13(A)(9). Here, construing the evidence most strongly in favor of the prosecution, the state presented evidence by which the jury could reasonably find that appellant knowingly obtained control of money by deception by submitting false billing statements to ODJFS for services she did not provide to Samuel. Because such evidence was sufficient to prove the elements of theft by deception and falsification in a theft offense, appellant's sufficiency argument is not well-taken.

{¶ 59} In challenging her convictions as against the manifest weight of the evidence, appellant cites her own testimony that she provided 35 hours per week of services to Samuel. Appellant further argues that personnel at the apartment building did not strictly follow security procedures.

{¶ 60} While appellant cites her own representations regarding the billed services she provided to Samuel, the trier of fact heard conflicting evidence on this issue, including appellant's own statements to investigators regarding the amount of hours she actually worked. It was within the province of the jury to assess the credibility of appellant, and the trier of fact was free to accept or reject her testimony. *State v. Hawk,* 10th Dist. No. 12AP-895, 2013-Ohio-5794, ¶ 56. In light of the verdict, the jury obviously found less than credible appellant's testimony that she worked all of the hours billed. Further, "[a] conviction is not against the manifest weight of the evidence because the jury chose to believe the state's version of events over the defendant's version." *Id.* at ¶ 59. Upon review, the jury did not lose its way and create a manifest injustice in rending its verdict, and we conclude that appellant's convictions under Counts 1 and 2 are not against the manifest weight of the evidence.

{¶ 61} Accordingly, appellant's fourth and fifth assignments of error are without merit and are overruled.

{¶ 62} Under the sixth assignment of error, appellant contends that the theft offenses under Counts 1 and 3 constitute a single offense, pursuant to R.C. 2913.61(C)(1), and, therefore, the trial court should have merged those counts for purposes of sentencing. Appellant acknowledges that defense counsel did not assert, prior to trial,

that the above statutory language required the state to try all the offenses as a single offense.

{¶ 63} R.C. 2913.61(C)(1) states in relevant part:

> When a series of offenses under section 2913.02 of the Revised Code * * * is committed by the offender in the offender's same employment, capacity, or relationship to another, all of those offenses shall be tried as a single offense. The value of the property or services involved in the series of offenses for the purpose of determining the value as required by division (A) of this section is the aggregate value of all property and services involved in all offenses in the series.

{¶ 64} Ohio courts have held that, "under R.C. 2913.61(C)(1) the phrase 'to another' connotes that the offender must have stolen from the same person or entity while carrying on in her same relationship." *State v. Greer,* 3d Dist. No. 14-99-26 (Dec. 1, 1999). *See also State v. Houseman,* 7th Dist. No. 98 BA 4 (June 29, 2000) ("Where the defendant steals from the same victim multiple times in an on-going relationship, R.C. 2913.61(C) instructs the court to try the defendant for a single offense, the level of which will depend on the aggregate amount of each theft."); *State v. Balo,* 3d Dist. No. 1-10-48, 2011-Ohio-3341, ¶ 37 ("Where there have been multiple theft offenses perpetrated in the offender's employment, R.C. 2913.61(C)(1) requires the State to try all of the offenses as a single offense.").

{¶ 65} Thus, in *State v. Preztak,* 181 Ohio App.3d 106, 2009-Ohio-621 (8th Dist.), the court held that a defendant's theft offenses were required to be aggregated, pursuant to the provisions of R.C. 2913.61(C)(1), where all of the defendant's repeated thefts occurred while she was in "the same employment with Associated [Estates Realty Corporation], who was the only victim." *Id.* at ¶ 15. In *State v. Crish,* 3d Dist. No. 1-08-13, 2008-Ohio-5196, all of the appellant's thefts occurred while she was "working for 3T Title Agency as an agent for Security Title Corp.," and thus "all thefts occurred while she was in the same 'employment, capacity, or relationship' to Security Title." *Id.* at ¶ 32. Further, Security Title was "[u]ltimately" the only victim of the defendant's actions, as it "was required to refund all money wrongfully appropriated from customers." *Id.* The court therefore held that "R.C. 2913.61(C)(1) required all theft offenses to be aggregated into one offense." *Id.*

{¶ 66} In *State v. Rice,* 103 Ohio App.3d 388 (10th Dist.1995), this court held that an appellant's theft offenses, arising from her involvement in a pension fund, should have been consolidated pursuant to R.C. 2913.61. While this court noted that the appellant "was not literally an 'employee' of the Fund," her theft offenses were committed and facilitated by her in her 'same * * * relationship,' that of 'independent contractor,' 'to another,' * * * the Fund." *Id.* Stated otherwise, this court held "there existed * * * a 'continuing relationship' between appellant and the Fund * * *, which relationship facilitated her theft offenses regardless of the name by which she called herself when committing the offenses." *Id.*

{¶ 67} In the instant case, appellant argues that Counts 1 and 3 both charge a course of conduct constituting theft by deception and that appellant stood in the same relationship to the victim (ODJFS). Upon review, we agree with appellant that the trial court should have merged the theft offenses for purposes of sentencing. Here, the theft offenses were committed against one victim, i.e., ODJFS. Further, while appellant was not an employee of ODJFS, she committed the theft offenses based upon her relationship to ODJFS as a Medicaid service provider under Ohio's Medicaid laws. Thus, the thefts were committed while appellant was in the same "employment, capacity, or relationship" to ODJFS.

{¶ 68} While, as noted, appellant failed to raise the applicability of R.C. 2913.61(C)(1) at trial, we find that the failure to merge these counts for sentencing purposes constitutes plain error. *See State v. Copeland,* 12th Dist. No. CA2003-12-320, 2005-Ohio-5899, *reversed on other grounds*, 110 Ohio St.3d 264, 2006-Ohio-4475 ("Despite appellant's failure to raise the applicability of R.C. 2913.61(C)(1) at trial, the failure to merge Counts 1 and 2 into a single offense constitutes plain error"). *See also State v. Weaver,* 8th Dist. No. 58114 (Aug. 16, 1990) (plain error where state improperly indicted defendant under R.C. 2913.61(C)). Accordingly, we sustain appellant's sixth assignment of error.

{¶ 69} Based upon the foregoing, the first, second, third, fourth, and fifth assignments of error are overruled, the sixth assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed

in part, and this matter is remanded to that court for the limited purpose of re-sentencing appellant based upon merger of the two counts of theft.

*Judgment affirmed in part and reversed in part;*
*cause remanded with instructions.*

DORRIAN and O'GRADY, JJ., concur.

_____