[Cite as *State v. Stepherson*, 2017-Ohio-7900.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | **No. 16AP-800**<br>(C.P.C. No. 16CR-300) |
| | | **and** |
| v. | : | **No. 17AP-54**<br>(C.P.C. No. 14CR-4140) |
| Laquan A. Stepherson, | : | |
| | | **(REGULAR CALENDAR)** |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 28, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

APPEALS from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Laquan A. Stepherson, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of felonious assault. Stepherson additionally appeals from a separate judgment entry of the Franklin County Court of Common Pleas revoking his community control on a previously entered guilty plea to one count of carrying a concealed weapon. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed August 4, 2014, plaintiff-appellee, State of Ohio, charged Stepherson in case No. 14CR-4140 with one count of carrying a concealed weapon in violation of R.C. 2923.12, a fourth-degree felony; one count of improperly handling

firearms in a motor vehicle in violation of R.C. 2923.16, a fourth-degree felony; and one count of tampering with evidence in violation of R.C. 2921.12, a third-degree felony. Stepherson initially entered a plea of not guilty.  However, on January 20, 2015, Stepherson entered a guilty plea to carrying a concealed weapon in exchange for the state entering a nolle prosequi on the other two charges.  The trial court sentenced Stepherson to 18 months of community control, journalizing his conviction and sentence in a January 20, 2015 judgment entry.

{¶ 3}   Separately, by indictment filed January 20, 2016, while Stepherson was still under community control, the state charged Stepherson in case No. 16CR-300 with one count of felonious assault in violation of R.C. 2903.11, a second-degree felony, along with an accompanying 3-year firearm specification pursuant to R.C. 2941.145(A).  The January 20, 2016 indictment related to the shooting of Darnell Wilson. Stepherson entered a plea of not guilty.

{¶ 4}   At the trial beginning on October 11, 2016, Chance Knox, an officer with the Columbus Division of Police, testified that he responded to a dispatch of a shooting at the Southpark Apartments on December 14, 2015.  When he reached the third floor landing, Officer Knox encountered a man lying on the floor with a gunshot wound to the abdomen. Officer Knox testified he noticed a shell casing and projectile that appeared to be a spent bullet nearby, so he secured the area until Ronald Lemmon, a detective with the Columbus Division of Police, arrived on the scene.

{¶ 5}   Patrick Nance, an officer with the Columbus Division of Police, testified he was the first officer to arrive on the scene and that he attempted to get a description of the shooter from the victim.  Officer Nance said the only description the victim could provide at that time was that "he knew it was Wax's cousin" who shot him.  (Oct. 12, 2016 Tr. Vol. 1.)  Officer Nance testified he relayed that information to Detective Lemmon.

{¶ 6}   Wilson testified that on December 14, 2015, he and his wife, Dionna Slaughter, were living on the third floor of the Southpark apartment complex.  That day, Wilson said he saw a neighbor named Trevor Moody, who also went by the name "Wax," walking toward his wife's place of employment.  Wilson had begun to suspect his wife was having an affair with Wax and had seen Wax running away from his apartment around the time his wife returned home from work.  Wilson testified he spent a few hours at his

brother's house that afternoon and evening, returning home around 10:30 that night. When he entered his apartment, Wilson said he saw Wax's jacket on his couch.

{¶ 7}   Wanting to confront Wax about his suspicions, Wilson went next door to Xavier Green's apartment where he knew Wax would be.  Wilson said he engaged in conversation with Wax until Wax got up and left.  When Wilson returned to his own apartment, he said his wife confessed to having an affair with Wax.  A couple of minutes later, Wilson said there was a knock at the door and, assuming it would be Green who was knocking, he told his wife to answer the door.  Wilson said a man he had never met was at the door and the man asked to talk to him in the hallway.  In court, Wilson identified the man who came to his door as Stepherson.

{¶ 8}   When Wilson went into the hallway, he said the man asked him "what's going on between you and my cousin."  (Tr. Vol. 1.)  Wilson assumed the man was Wax's cousin based on that question.  Wilson said he told the man about the relationship between his wife and Wax, and he said the man responded "that's messed up. People shouldn't be doing that."  (Tr. Vol. 1.)  While he was talking to the man on the third floor landing, Wilson said he could see a shadow on the stairs between the second and third floors.  After their brief conversation, Wilson said the man stepped down one stair in the stairwell and then pulled out a gun.  Wilson testified he "tussl[ed]" with the man in the hallway and that the man ended up shooting him.  (Tr. Vol. 1.)  When his wife came outside, he pushed her back inside and told her to call the police.  Wilson testified he was treated at Mount Carmel West for a gunshot wound where doctors had to remove eight inches of his intestine, and that the bullet also shattered his elbow.

{¶ 9}   While he was still in the hospital, Wilson said Detective Lemmon came to speak to him but he was uncooperative.  Wilson testified he was angry at himself and at his wife and he initially did not want to help with the investigation.  Approximately two days after the shooting, Wilson said his wife received a Facebook friend request from Stepherson and that they both recognized the person in the photograph as the shooter. Wilson said he tried to contact Detective Lemmon about the Facebook friend request while he was still in the hospital but was unsuccessful due to his ongoing treatment. Wilson eventually made contact with Detective Lemmon in January 2016.  He testified that he showed Detective Lemmon the Facebook photograph and that Detective Lemmon

showed him some additional photographs.  From a photo lineup of six pictures, Wilson identified a photograph of Stepherson as the shooter.  The photograph was a different photograph than what was contained in the Facebook friend request.  Wilson testified he knew the person in the photograph was the person who shot him because he was face-to-face with his assailant.

{¶ 10} Slaughter testified that she had engaged in an intimate relationship with Wax.  On the night of December 14, 2015, Slaughter said she could hear Wilson yelling at Wax when he went to Green's apartment, threatening to "beat [him] up" because of Wax's relationship with Slaughter.  (Tr. Vol. 1.)  After Wilson returned to their apartment and they heard a knock at the door, Slaughter said she was the one to answer the door.  She did not know the man at the door that night, but she identified him in court as Stepherson.  Slaughter testified she did not follow her husband into the hallway with Stepherson but that she heard the gunshot.  Slaughter called 911, and she said the police arrived before the paramedics.

{¶ 11} Slaughter stated she gave a description of the shooter to Detective Lemmon when he arrived at the scene.  While Wilson was still in the hospital, Slaughter said she was scrolling through her Facebook friend requests when she came across a picture of the shooter.  She said she recognized him right away because she remembered his eyes very clearly.  Slaughter did a screenshot of Stepherson's Facebook photo using her mother's phone and sent it to Wilson's mother.  Wilson had access to Slaughter's Facebook account, so he accessed her Facebook account while he was in the hospital and saw the photograph of Stepherson.

{¶ 12} Slaughter testified that after Wilson eventually spoke to Detective Lemmon, she participated in a separate photo array identification with Detective Lemmon.  From a series of six photographs, she identified a photo of Stepherson as the man who came to the apartment door on December 14, 2015.  She testified she is "sure" Stepherson is the man who shot her husband.  (Tr. Vol. 1.)  Slaughter said Stepherson used an alias on Facebook but that she eventually learned his real name from Detective Lemmon.

{¶ 13} Brian Wildman, a detective with the Columbus Division of Police, testified that he served as the blind administrator on the photo arrays during the investigation.  Detective Wildman said that Detective Lemmon put together a six-photo array and had

him present the photographs to both Wilson and Slaughter. Both Wilson and Slaughter separately selected a photograph of Stepherson from the six photographs and identified him as the person who came to the apartment door and shot Wilson. Detective Wildman placed the photograph of Stepherson in different positions when he administered the photo arrays to Wilson and Slaughter.

{¶ 14} Detective Lemmon testified that he was the lead detective assigned to the case and that when he responded to the scene of the shooting, officers had observed a shell casing, a spent projectile, blood, and clothing on the third floor of the apartment building. He spoke to Slaughter, and she described the man who came to the door as a black male between 24 and 25 years old, around 6 feet tall, approximately 160 pounds, curly hair with braids, and facial hair. Detective Lemmon said that when he went to interview him at the hospital, Wilson initially did not want to pursue the case and seemed scared. About one week later, however, Detective Lemmon said that Wilson contacted him to provide the information about his wife seeing the shooter's picture on Facebook. At that point, Detective Lemmon met with Wilson and interviewed him, and Wilson provided him with the alias associated with the Facebook account.

{¶ 15} Detective Lemmon said he was able to connect the alias to Stepherson, so he obtained a picture of Stepherson from the law enforcement database and included that photograph in the photo array he had prepared. Detective Lemmon had Detective Wildman administer the photo array to both Wilson and Slaughter outside of his presence, and both Wilson and Slaughter identified a photograph of Stepherson as the shooter. The photograph he had obtained of Stepherson was consistent with Slaughter's description of the shooter other than the hairstyle.

{¶ 16} After both Slaughter and Wilson identified Stepherson from the photo array, Detective Lemmon obtained a warrant for Stepherson's arrest. When Detective Lemmon interviewed Stepherson, Stepherson denied knowing anyone named Moody or Wax. Later in the interview, however, after Detective Lemmon brought up Facebook, Stepherson admitted to knowing Wax but said he did not know him well. Stepherson denied being anywhere near the Southpark apartments the night Wilson was shot and said he spent the entire night with his girlfriend in the Short North neighborhood of

Columbus. Detective Lemmon said he was unable to locate Stepherson's girlfriend. Similarly, he was unable to locate Wax.

{¶ 17} A friend of Stepherson's, Robert Hunt, testified that on the night of December 14, 2015, he and Stepherson spent the night with a friend in the Short North. Hunt said they spent the entire day going from their friend's apartment to the nearby Kroger and back again, and he said that Stepherson's girlfriend and her friend eventually came to visit them. On cross-examination, Hunt said he has known both Stepherson and Wax since they were very young and that Stepherson and Wax used to hang out together.

{¶ 18} Following deliberations, the jury returned a guilty verdict on the felonious assault charge and the accompanying firearm specification. At an October 20, 2016 sentencing hearing, Stepherson entered a guilty plea in a third case, case No. 16CR-5426, on one count of possession of cocaine, a fifth-degree felony. Based on the guilty plea in case No. 16CR-5426 and the guilty verdict in case No. 16CR-300, the trial court found Stepherson to be in violation of his probation in case No. 14CR-4140. The trial court imposed an aggregate sentence for all three cases of seven years and six months' imprisonment. Specifically, the trial court imposed a six-month sentence in case No. 14CR-4140, ordering that sentence to run consecutive to the seven-year sentence in case No. 16CR-300 and concurrent to the six month sentence in case No. 16CR-5426. The trial court journalized Stepherson's convictions and sentence in an October 24, 2016 judgment entry in case No. 16CR-300 and in an October 24, 2016 revocation entry in case No. 14CR-4140.

{¶ 19} Stepherson timely appeals from the judgment entry in case No. 16CR-300. Additionally, Stepherson filed a motion for delayed appeal in case No. 14CR-4140 which this court granted in a January 26, 2017 entry. This court sua sponte consolidated the cases for purposes of appeal.

## II. Assignment of Error

{¶ 20} Stepherson assigns the following error for our review:

> The trial court erred and deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and Article One Section Ten of the Ohio Constitution by finding him guilty of felonious assault as

that as that verdict was not supported by sufficient evidence
and was also against the manifest weight of the evidence.

## III.  Discussion

{¶ 21} In his sole assignment of error, Stepherson argues his conviction for felonious assault is not supported by sufficient evidence and is also against the manifest weight of the evidence.  He further argues that if sufficient evidence and the manifest weight of the evidence did not support his felonious assault conviction, the trial court must also reverse its finding that Stepherson violated the terms of his community control in case No. 14CR-4140.

### A.  Sufficiency of the Evidence

{¶ 22} Whether there is legally sufficient evidence to sustain a verdict is a question of law.  *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  Sufficiency is a test of adequacy.  *Id.*  The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.  *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 23} To prove Stepherson committed felonious assault in violation of R.C. 2903.11, the state was required to show that Stepherson knowingly caused serious physical harm to another or caused or attempted to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(1) through (2).

{¶ 24} Though Stepherson captions his argument as a challenge to both the sufficiency and manifest weight of the evidence, his entire argument under this assignment of error relates to the credibility of the witnesses.  However, "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.  The sole issue at trial was one of identity. Stepherson does not raise any arguments related to the state's failure to prove any specific element of any of the crimes charged but instead argues the evidence the state relied upon to prove he was the perpetrator lacked credibility.  Thus, we address Stepherson's

argument regarding credibility of the witnesses in our analysis of the manifest weight of the evidence.

### B. Manifest Weight of the Evidence

{¶ 25} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 26} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 27} Stepherson argues his convictions are against the manifest weight of the evidence because the witnesses' testimony was not credible. First, Stepherson argues both Wilson and Slaughter lacked credibility in their identification of Stepherson because by their own description of the events, they only saw the assailant for "a few seconds at best," and it was dark outside. (Stepherson's Brief at 2.) However, it was within the province of the jury to believe both Wilson's and Slaughter's testimony that they were

positive they were identifying the correct person both when they saw his picture on Facebook and in the photo array prepared by police. *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a witness). Wilson additionally testified he was with his assailant long enough to engage in conversation and to briefly scuffle with him when he saw the gun, while Slaughter testified she distinctly remembered Stepherson's eyes because she stood so close to him when she opened the door. Thus, neither Wilson's nor Slaughter's testimony was "so incredible as to render appellant's convictions against the manifest weight of the evidence." *Id.* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 35.

{¶ 28} Additionally, Stepherson argues that although the photo arrays administered to Wilson and Slaughter "had the gloss of impartiality and statutory compliance," the results of the photo array identifications were not reliable because Wilson waited some time before contacting Detective Lemmon after seeing the Facebook photograph of Stepherson. (Stepherson's Brief at 3.) We note that police used a different photograph of Stepherson than the photo that appeared on Facebook in performing the photo array identifications, that neither Wilson nor Slaughter had any hesitancy in identifying Stepherson from the photo array, and that both Wilson and Slaughter identified Stepherson in court as the assailant. Thus, we do not agree with Stepherson that Wilson's and Slaughter's identifications of him somehow render his conviction against the manifest weight of the evidence. *See State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 35 (convictions not against the manifest weight of the evidence where witnesses provided a positive in-court identification).

{¶ 29} Finally, Stepherson notes the lack of physical evidence connecting him to the shooting. However, "[a] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence." *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *Id.*, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16. Wilson and Slaughter both identified

Stepherson as the gunman. Though Stepherson denied his involvement to police and Hunt testified that Stepherson was with him during the time of the shooting, it was within the province of the jury to believe Wilson and Slaughter and disbelieve Hunt. Thus, considering all the evidence, we cannot say the jury lost its way in giving more credibility and weight to the testimony of Wilson and Slaughter than it did to Stepherson's statements to police and the testimony of Hunt.

{¶ 30} Considering all of the evidence together, the jury did not clearly lose its way in concluding Stepherson was the person who shot Wilson. After an independent review of the record, we find sufficient evidence to support Stepherson's convictions, and Stepherson's convictions are not against the manifest weight of the evidence. We overrule Stepherson's sole assignment of error.

## IV. Disposition

{¶ 31} Based on the foregoing reasons, the sufficiency and manifest weight of the evidence support Stepherson's conviction for felonious assault, and the trial court did not err in finding Stepherson violated the terms of his community control. Having overruled Stepherson's sole assignment of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

TYACK, P.J., and BRUNNER, J., concur.

_____