[Cite as *State v. Sherman*, 2021-Ohio-4532.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                        :

     Plaintiff-Appellee,                         :                  No. 20AP-541
(C.P.C. No. 19CR-3617)

v.                                                         :

                                        (REGULAR CALENDAR)

Patrick R. Sherman,                              :

     Defendant-Appellant.                     :

---

D E C I S I O N

Rendered on December 23, 2021

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Michael P. Walton*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Patrick R. Sherman, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of attempted burglary, aggravated arson, and menacing by stalking. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} By indictment filed July 25, 2019, plaintiff-appellee, State of Ohio, charged Sherman with one count of attempted burglary in violation of R.C. 2923.02 and 2911.12, a third-degree felony; one count of aggravated arson in violation of R.C. 2909.02, a second-degree felony; and one count of menacing by stalking, in violation of R.C. 2903.211, a fourth-degree felony. Sherman entered a plea of not guilty.

{¶ 3} At a trial beginning October 5, 2020, T.J. testified that she began dating Sherman in December 2016 or January 2017. By September 2017, T.J. said Sherman moved in with her and her daughter at Varden Court. After learning that Sherman had been unfaithful, T.J. said she ended her relationship with Sherman and that he moved out of her home in June or July 2018. A short time later, T.J. and Sherman reconciled. However, T.J. testified that she learned in November 2018 that Sherman was still being unfaithful so she again ended their relationship. In the days following their breakup, T.J. said Sherman made threatening phone calls to her. T.J. said Sherman demanded she return his property, though she testified she did not have any of his property at her home.

{¶ 4} On November 27, 2018, T.J. said that Sherman called her and told her he would "go ballistic" on her. (Tr. Vol. 2 at 278.) A few days later, T.J. said Sherman called again and demanded his property, threatening to "snap [her] neck" if she did not return it. (Tr. Vol. 2 at 279.) After that second phone call, T.J. called the police. An officer with the Columbus Division of Police responded and took a report on December 1, 2018.

{¶ 5} Subsequently, T.J. testified she obtained a civil protection order against Sherman. However, when T.J. did not attend a follow-up hearing, the order lapsed. T.J. testified she did not attend the follow-up hearing because Sherman had been arrested by that time and was in prison.

{¶ 6} In June 2019, T.J. said Sherman contacted her to inform her he had been released from prison and wanted to come "home" to T.J.'s residence. (Tr. Vol. 2 at 287.) T.J. testified that she told Sherman he was not welcome at her residence and that it was time for him to move on with his life. After his release from prison, T.J. said she received regular phone calls from Sherman.

{¶ 7} In late June 2019, T.J. said Sherman came to her residence uninvited, blocking T.J.'s driveway with the pickup truck he was driving. T.J. testified she spoke to Sherman in the driveway and that Sherman kept asking her whether she had a new boyfriend. When T.J. refused to answer the question, she said Sherman told her he had something for her in his truck and showed her a red gas container in the back of the truck. T.J. testified that Sherman told her that he kept the gas container just for her and that if he ever saw her with another man, he would "make [her] unrecognizable." (Tr. Vol. 2 at 291.) This encounter left T.J. feeling "[t]hreatened, unsafe, [and] alarmed." (Tr. Vol. 2 at 291.)

{¶ 8} A few days after the encounter in her driveway, T.J. said Sherman called her again asking to come collect his property that he believed was at her house. T.J. said Sherman told her that if she did not return his belongings to him, he "was going to come and set the apartments on fire." (Tr. Vol. 2 at 292.) Additionally, T.J. said Sherman told her he would start another fire at the other end of her apartment complex so it would not be obvious that she was the target.

{¶ 9} T.J. said Sherman then began making repeated phone calls to her with increasing frequency, testifying he called her up to 125 times in one day starting in July 2019. The phone calls would appear on her phone as "no-caller ID" or as random numbers based in Mansfield, Ohio, a location T.J. associated with Sherman. (Tr. Vol. 2 at 293.) T.J. reported the activity to police on July 1, 2019. Officer Janetta Place responded to take a report and, while Officer Place was with T.J., Sherman called again. Officer Place spoke directly to Sherman and told Sherman that T.J. did not want to hear from him again and that Sherman should stop calling. After Sherman told Officer Place he wanted to get his property back from T.J., Officer Place told Sherman his recourse was to go through the civil process of recovering property. Even after Officer Place's conversation with Sherman, T.J. said that Sherman continued to call her repeatedly. T.J. said Sherman always had multiple cell phones at any given time.

{¶ 10} Around 2:00 a.m. on July 11, 2019, T.J. said her daughter woke her up to tell her someone was trying to kick in the front door. T.J. testified she heard a "blunt thud hitting the front door," so she grabbed a firearm she kept in her nightstand and her cell phone and told her daughter to hide in the closet. (Tr. Vol. 2 at 303.) T.J. testified she bought the firearm in the summer of 2018 because Sherman had been making her feel unsafe. T.J. said she joined her daughter in the closet and called 911 to report someone trying to break into her residence. This first 911 call was placed at 2:02 a.m. Eventually, T.J. said she left the closet to see who was continually hitting the front door. When she looked out the window, T.J. said she could see Sherman standing on her front porch.

{¶ 11} T.J. testified she then ran back to the closet to get her daughter, and the two of them went into the bathroom where she called 911 again and told the dispatcher to hurry. The second 911 call occurred at 2:20 a.m. T.J. said she could hear more thudding on the front door, a jingling of the front door handle, and banging sounds against her daughter's

bedroom window. Additionally, T.J. testified she could smell gasoline throughout her residence at this time.

{¶ 12} Columbus Division of Police Officer Alex Zamora responded to the scene after initially responding to an incorrect address. Officer Zamora testified that the front door appeared to be smoking and had a large black burn mark on it. Additionally, the door mat was charred and burning. Officer Zamora said one of the windows at the residence appeared to have a shimmering substance on it with a paper towel on the ground beneath it. There was also a light on the exterior of the residence that had been tampered with and was no longer functional. T.J. testified that, prior to that evening, her exterior light had been in proper working order.

{¶ 13} Firefighter Lew Smith, with the Columbus Division of Fire, also responded to the scene with an ignitable liquids detection canine. The ignitable liquids canine alerted to the presence of an ignitable liquid on multiple areas of the residence, including the front door mat and the window. Smith testified he took samples and swabs from the areas where the canine had alerted. Subsequent forensic analysis of the samples tested positive for the presence of gasoline.

{¶ 14} Derrick Young, an investigator with the Columbus Division of Fire, testified that his investigation indicated the fire was not caused by natural occurrences or accidental means. Young explained that the fire was short lived and that an additional fuel source was present. Additionally, Young testified that T.J. received two calls from the same phone number shortly before T.J.'s 911 calls. Young testified the phone number that had called T.J. was from a location consistent with known locations for Sherman. That same phone number also placed two additional phone calls to T.J.'s phone around 2:00 a.m. using a caller ID blocking feature.

{¶ 15} Over the objection of Sherman's counsel, the trial court admitted into evidence a letter that Sherman had written and attempted to mail to Kenyon Selman while Sherman was incarcerated and awaiting trial. Scott Thompson, an investigator for the Ohio Department of Rehabilitation and Correction, read the letter as follows:

> Man Unc, listen to me. I wrote you another letter. It was too emotional, so I am rewriting you now. Look, I need the witnesses' names ASAP. If you can get in touch with Bernie Davis, let him know that I need my quick and fast speedy trial,

and I've been having people trying to contact him of the matter to no avail. Also, I need this bitch who put the bogus case on me, I need her clapped ASAP. I need her to be shot in her face or even set up. Have one of them white girls get a rental, go up to Columbus and have someone shoot up the rental. Give the people her description and her plate number and have them point her out and testify on that hoe. They say the only thing that beats a double cross is a triple cross. Her address is * * *.

Dude, you can pull up to the spot, park right cross from her spot and chill. Wait for her to pull out and get the plate number description of her car. Her description or you can be a random [derogatory term] and try to knock her off. She ain't nothing by a homely thirsty hoe. She'll go knock her down and put it down because she's trying to take my life all because her feelings got hurt. She tried to control me and allow her ten-year-old daughter have control over me, disrespect me and if I buck, she denied me sex after I just came home from doing nine years. That was degrading and I went for it over almost a year because my PRC papers was on her house and the type person she is she called if I left, and she did. So I tried to tough shit out. Then she wanted me to get my own slot because her daughter is a brat and we wasn't getting along because the more the man lived to her, made her think that we wasn't [F word] because she was trying to teach her that you're not supposed to be sexting before marriage. Which I went along with her, but the [little N word] used to keep a glass up against the wall so she would listen intently. Once she found out her mom was * * * getting dick, she would totally disrespect me. I'd respond and go on a * * * pussy restriction for weeks until I swallow my pride and apologize to the child for talking crazy to her. This happened weekly. Then she kicked me out about a 22-year-old who sent pics to my cell phone and she found, so then I went back to Mansfield bumped into my girl and started rocking with her. Now that I'm not begging and pleading for sex and to come home, now she wants to contact me. But I'm in a whole new relationship. But PRC is still on her crib. Once she found out about by girl, all hell broke loose.

Look, get with my junior. His number * * *. You all figure out how to smash this hoe. Her number is * * *. Don't call on your phone. She is on some other shit. If you trying to reason with her, let her know that I'm not going to come at her when I get out if she gets off the hoe shit. Not over the phone, though. Ask can you take her out for lunch or coffee. She wants to be a classy person. Do not mention my name over the phone. Ask

can you all meet in a public place somewhere to chat about something. I'm stuck in here until the end of the year. All ready about this bitch. She's trying to get me more than that * * * man, I want this hoe knocked the fuck down. And when I get out, I really wasn't coming after her. That's my word, Unc. But I got something else for that bitch. Just like I wish I'd never met her. She's going to feel the same way. This shit is fucked up. And her complex it states is clearly under surveillance. The only reason why I am locked now is because it was reportedly not operational. Whatever that means. I had killer bee talking to the hoe. She was all emotional on some BS. She said she acted like she wasn't on it, but she came in here and straight got down on me. I wasn't someone to knock a chunk out that fat bitch's head. The world needs to eliminate people like her. She doesn't play fair. She didn't want me until she found out I actually had someone else. Now I'm over the fat bitch. Unc, I ain't [gone drag] your ear. But I'll pay to get it done for sure. You know I got you. I love you, Unc. Your favorite nephew P. Give your mom a hug and kiss for me.

PS, you can let her know I put it in on my granddad Billy, I will leave her completely alone if she gets off the bullshit. And as far as for you, start checking on your people. You know my grandma Ann been in the hospital for weeks. I can't even check on her. Let the bitch know too if you can get a connection with her.

(Tr. Vol. 2 at 414-19.)

{¶ 16} Following deliberations, the jury found Sherman guilty of all three offenses. After an October 20, 2020 sentencing hearing, the trial court sentenced Sherman to an aggregate term of ten to thirteen and one-half years in prison. The trial court journalized Sherman's convictions and sentence in an October 21, 2020 judgment entry. Sherman timely appeals.

## II. Assignments of Error

{¶ 17} Sherman assigns the following errors for our review:

[1.] Patrick, Sherman was denied the right to a fair trial under the Sixth and Fourteenth Amendment to the United States Constitution and Article I, Sections 1, 10, and 16 of the Ohio Constitutions when inflammatory and unfairly prejudicial evidence was presented to the jury in violation of Ohio Evid. R. 403.

[2.] The trial court erred when it denied Patrick Sherman's Rule 29 Motion for Acquittal.

[3.] The verdicts of guilt as to all three counts were against the manifest weight of the evidence.

## III. First Assignment of Error – Evidentiary Ruling

{¶ 18} In his first assignment of error, Sherman argues the trial court erred in admitting into evidence the letter he wrote and attempted to mail to Selman while he was incarcerated. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 19} Sherman's argument under this assignment of error relates to the letter that he wrote and attempted to mail to Selman while Sherman was in jail awaiting trial. The letter, as noted above, included requests for the recipient to shoot and/or kill T.J., providing her address and phone number. The letter also contained details of Sherman's relationship with T.J. Sherman asserts the letter was unfairly prejudicial.

{¶ 20} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 21} As to the letter here, Sherman argues that any potential probative value of the letter was minimal as it did not include an admission of his guilt. Instead, he construes the letter as demonstrating his anger at being accused of the offenses but not as indicative of his commission of the offenses. However, Sherman's entire defense was that he was not the perpetrator of the offenses. Where a defendant disputes that he is the perpetrator, "identity [is] squarely at issue." *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 118. The letter contained information establishing the relationship between Sherman and

T.J. and showed Sherman's connection to Mansfield, the originating location of the repeated phone calls T.J. received. Additionally, the letter included instructions for the recipient to harm T.J., thus making her unavailable to testify against Sherman. " 'Evidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt.' " *State v. Gordon*, 152 Ohio St.3d 528, 2018-Ohio-259, ¶ 28, quoting *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 68. Thus, the letter contained relevant evidence on both the perpetrator's identity and on Sherman's consciousness of guilt.

{¶ 22} Despite the letter's relevance, Sherman argues the trial court nonetheless abused its discretion in admitting the letter into evidence because the danger of unfair prejudice substantially outweighed the probative value of the evidence. " 'If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." ' " *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Thus, " '[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *Id.*, quoting *Oberlin* at 172. Evidence may be unfairly prejudicial if it " 'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.' " *Id.*, quoting *Oberlin* at 172. Often, though not always, evidence is unfairly prejudicial if it appeals to the jury's emotions rather than the jury's intellect. *Id. See also Worley* at ¶ 125.

{¶ 23} Fairness is subjective and thus the determination whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 69 (2000). The state argues the trial court appropriately determined the probative value of the evidence outweighed the danger of unfair prejudice and admitted the letter into evidence. Given the inflammatory statements in the letter, Sherman asserts the letter is "arresting enough to lure a juror into a sequence of bad character reasoning" and use that character reasoning as the basis for finding him guilty. *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, ¶ 36. However, Sherman did not seek to redact certain portions of the letter but instead sought to exclude the entire letter from evidence. Having reviewed the record, we agree with the state that the letter was highly probative as to Sherman's consciousness of guilt and was additionally probative as

to the perpetrator's identity. *See State v. Smith*, 162 Ohio St.3d 353, 2020-Ohio-4441, ¶ 50 (" '[a]s the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases' ") (emphasis sic), quoting *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 31.

{¶ 24} Additionally, we note the trial court provided an appropriate limiting instruction related to the letter as follows:

> Evidence was received about the incarceration and parole status of the defendant in this case. That evidence was received only for a limited purpose to explain where the Defendant may have been located at certain times, how certain items were obtained, et cetera. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character.
>
> Testimony has been admitted indicating that the defendant attempted to instruct someone to intimidate and/or murder and/or tamper with a witness. You are instructed that this alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt. If you find that the facts do not support that the defendant attempted to instruct someone to intimidate and/or murder and/or tamper with a witness or if you find that some other motive prompted the defendant's conduct, or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose. However, if you find that the facts support that the defendant engaged in such conduct and if you decide that the defendant was motivated by a consciousness of guilt, you may, but are not required to, consider that evidence in deciding whether the defendant is guilty of the crimes charged. You alone will determine what weight, if any, to give to this evidence.

(Tr. Vol. 3 at 617-18.) A jury is presumed to follow the instructions of the court, including limiting instructions. *State v. Hicks*, 10th Dist. No. 18AP-883, 2020-Ohio-548, ¶ 23, citing *State v. Shipley*, 10th Dist. No. 12AP-948, 2013-Ohio-4055, ¶ 62. The limiting instruction provided here mitigated any danger that the jury would unfairly consider the letter as proof of Sherman's bad character or that he acted in accordance therewith. *Hicks* at ¶ 22-23.

{¶ 25} Thus, we find the trial court did not abuse its discretion in determining the probative value from the letter outweighed any potential prejudice. *See State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 33-34 (finding no error in the admission of photographs of victim's severe burn injuries, noting "[t]hat the photographs may be gruesome does not render them inadmissible if they otherwise satisfy the balancing test of Evid.R. 403(A)"). Further, as Sherman acknowledges in his brief, the state had introduced ample other evidence of Sherman's guilt. Therefore, even if the letter was inflammatory, Sherman cannot demonstrate it unfairly affected the jury's verdict. *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 41, quoting *Darazim* at ¶ 16 (stating " '[a] trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that *materially prejudices* the affected party' ") (emphasis added).

{¶ 26} For these reasons, the trial court did not abuse its discretion in admitting the letter into evidence. We overrule Sherman's first assignment of error.

## IV. Second Assignment of Error – Crim.R. 29 Motion for Acquittal

{¶ 27} In his second assignment of error, Sherman argues the trial court erred when it denied his Crim.R. 29 motion for acquittal. More specifically, Sherman asserts the state did not present sufficient evidence to prove the elements of attempted burglary, aggravated arson, and menacing by stalking.

{¶ 28} Crim.R. 29 provides that the court, "on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Review of the denial of a Crim.R. 29 motion and the sufficiency of the evidence apply the same standard. *State v. Fugate*, 10th Dist. No. 12AP-194, 2013-Ohio-79, ¶ 5, citing *State v. Turner*, 10th Dist. No. 04AP-364, 2004-Ohio-6609, ¶ 8. Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th

Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

### A. Attempted Burglary

{¶ 29} Sherman asserts there was insufficient evidence to convict him of attempted burglary in violation of R.C. 2923.02 as it relates to R.C. 2911.12. R.C. 2911.12(A)(2) states "[n]o person, by force, stealth, or deception shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense."

{¶ 30} Further, R.C. 2923.02(A) defines attempt as "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." Additionally, the Supreme Court of Ohio has defined "criminal attempt" as " 'an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime.' A 'substantial step' requires conduct that is 'strongly corroborative of the actor's criminal purpose.' " *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 101, quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus. Thus, under the pertinent statutes, the state was required to prove Sherman knowingly engaged in conduct that, if successful, would have constituted burglary pursuant to R.C. 2911.12(A)(2).

{¶ 31} Sherman asserts the evidence was insufficient to convict him of attempted burglary because the state did not present any evidence that he attempted, by force, stealth, or deception, to enter T.J.'s residence. However, T.J. testified she heard a blunt thud hitting the front door and that she continued to hear someone banging against the door while she hid in the closet with her daughter. The thudding was strong enough to knock a picture off the wall that had been hanging by the front door. T.J. further testified she heard the doorknob jingling and more banging against her daughter's bedroom window. This testimony constitutes sufficient evidence that Sherman attempted, through force, to trespass into T.J.'s residence.

{¶ 32} Sherman additionally argues the state did not present any evidence that he had the intent to commit a criminal offense once inside the habitation. A person acts with

a particular purpose when "it is [his or her] specific intention to cause a certain result." R.C. 2901.22(A). "The law has long recognized that intent, lying as it does within the privacy of a person's own thoughts, is not susceptible of objective proof." *State v. Garner*, 74 Ohio St.3d 49, 60 (1995), citing *State v. Carter*, 72 Ohio St.3d 545, 554 (1995). The trier of fact may consider the entire set of circumstances surrounding the event and infer intent from those facts. *State v. Loughman*, 10th Dist. No. 10AP-636, 2011-Ohio-1893, ¶ 47, citing *State v. Grant*, 67 Ohio St.3d 465, 478 (1993).

{¶ 33} In support of his argument, Sherman asserts that because the arson occurred on the exterior of the home, there was no evidence that he had the intent to commit a criminal offense inside the home. However, though Sherman was unsuccessful in entering the residence, the jury nonetheless could have inferred that, had he been successful, he had the purpose to commit arson or another offense inside the home. T.J. testified that Sherman had threatened her with a gas can prior to July 11, 2019. Additionally, it was only after Sherman was not successful in opening the apartment door that he set fire to the exterior of the apartment. We conclude this is sufficient evidence from which a trier of fact could infer that Sherman had the requisite intent to commit a criminal offense once inside the habitation.

{¶ 34} Thus, because there was sufficient evidence to support Sherman's conviction of attempted burglary, the trial court did not err in denying the Crim.R. 29 motion with respect to attempted burglary.

### B. Aggravated Arson

{¶ 35} Sherman additionally argues there was insufficient evidence to convict him of aggravated arson. To convict Sherman of aggravated arson pursuant to R.C. 2909.02(A), the state must prove Sherman, by means of fire or explosion, knowingly caused physical harm to an occupied structure. R.C. 2909.02(A)(2); *State v. Albert*, 10th Dist. No. 14AP-30, 2015-Ohio-249, ¶ 15. "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime. *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-

4075, ¶ 22.  Culpable mental states are frequently demonstrated through circumstantial evidence.  *Id.*

{¶ 36}  Sherman does not assert that the state failed to produce evidence on any of the specific elements of aggravated arson.  Instead, Sherman asserts generally that the evidence of aggravated arson was "very weak."  (Appellant's Brief at 14.)  However, having reviewed the record, we find T.J.'s testimony about Sherman's threatening behavior prior to July 11, 2019, her testimony that Sherman was outside her house when she heard him attempting to enter and shortly before she smelled gasoline, and the evidence of the fire at the front door with the use of gasoline as an accelerant constitutes sufficient evidence to convict Sherman of aggravated arson.  Thus, the trial court did not err in denying Sherman's Crim.R. 29 motion of acquittal related to the charge of aggravated arson.

### C.  Menacing By Stalking

{¶ 37}  Finally under this assignment of error, Sherman argues there was insufficient evidence to support his conviction of menacing by stalking.  R.C. 2903.211 defines "menacing by stalking" as "engaging in a pattern of conduct" which will "knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person."  R.C. 2903.211(A)(1).  A "pattern of conduct" is "two or more actions or incidents closely related in time."  R.C. 2903.211(D).  Further, to support a conviction of menacing by stalking as a fourth-degree felony, the state must also demonstrate that Sherman made a threat of physical harm to or against T.J. or, in committing the offense, caused serious physical harm to the premises at which T.J. resided, to the real property on which the premises were located, or to any personal property located on that premises.  R.C. 2903.211(B)(2).

{¶ 38}  Just as he did in his argument related to aggravated arson, Sherman does not assert the state failed to present evidence on any specific element of menacing by stalking but instead asserts more generally that the evidence the state presented was "very weak." (Appellant's Brief at 14.)  However, T.J.'s testimony provided sufficient evidence to convict Sherman of menacing by stalking.  T.J. provided detailed testimony about the number of phone calls and unsolicited encounters she had with Sherman, including his threats to "go ballistic," "snap [her] neck," and make her "unrecognizable" with a gas can.  T.J. further testified she was afraid of Sherman and purchased a firearm to protect herself from him.

The evidence also demonstrated that Sherman set fire to T.J.'s apartment front door, supporting the conviction as a fourth-degree felony. Accordingly, the trial court did not err in denying Sherman's Crim.R. 29 motion with respect to the charge of menacing by stalking.

{¶ 39} Because the state presented sufficient evidence to support Sherman's convictions of attempted burglary, aggravated arson, and menacing by stalking, the trial court did not err in denying Sherman's Crim.R 29 motion for acquittal. We overrule Sherman's second assignment of error.

## V. Third Assignment of Error – Manifest Weight of the Evidence

{¶ 40} In his third and final assignment of error, Sherman argues his convictions are against the manifest weight of the evidence.

{¶ 41} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 42} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence

weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 43} Sherman does not point to any conflicts in the evidence. Instead, Sherman argues his convictions are against the manifest weight of the evidence because T.J. lacked credibility. However, a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version of events. *State v. Szykulski*, 10th Dist. No. 19AP-639, 2021-Ohio-2733, ¶ 25, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. As noted above, the trier of fact remains free to believe "all, part, or none of a witness's testimony." *Raver* at ¶ 21. Sherman does not identify any specific reason that T.J.'s testimony lacks credibility but suggests the jury lost its way in believing T.J.'s testimony because there were no additional eyewitnesses. However, evidence corroborating the victim's testimony is not required for a conviction. *State v. Jackson*, 10th Dist. No. 06AP-1267, 2008-Ohio-1277, ¶ 16. *See also State v. Vinson*, 10th Dist. No. 13AP-825, 2014-Ohio-3249, ¶ 17 ("[t]he victim's testimony alone is satisfactory evidence on which to base a conviction"). Having reviewed the record in its entirety, we do not find the jury clearly lost its way in finding T.J.'s testimony to be credible.

{¶ 44} Moreover, to the extent Sherman argues his convictions are against the manifest weight of the evidence due to the lack of physical or forensic evidence connecting him to the offenses, this court has repeatedly stated that " '[a] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence.' " *State v. Murray*, 10th Dist. No. 16AP-16, 2017-Ohio-949, ¶ 38, quoting *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other [type of] physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence). As we stated above, T.J. provided credible testimony about Sherman's conduct throughout 2018 and 2019, including his conduct during the early morning hours of July 11, 2019.

{¶ 45} Thus, in light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding the state proved Sherman committed each of the three offenses. We conclude, therefore, that the manifest weight of the evidence supports Sherman's convictions of attempted burglary, aggravated arson, and menacing by stalking. Accordingly, we overrule Sherman's third and final assignment of error.

## VI. Disposition

{¶ 46} Based on the foregoing reasons, the trial court did not abuse its discretion in admitting Sherman's letter into evidence, the trial court did not err in denying Sherman's Crim.R. 29 motion for acquittal, and the manifest weight of the evidence supports Sherman's convictions of attempted burglary, aggravated arson, and menacing by stalking. Having overruled Sherman's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and MENTEL, J., concur.